## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., <br><br> Plaintiff, <br><br> v. <br><br> ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; ANTHONY D. GULLUNI, in his official capacity as Hampden County District Attorney, <br><br> Defendants. | Case No. 1:26-cv-10513 |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## INTRODUCTION

1.      This is a civil rights action challenging the constitutionality of the Massachusetts Wiretap Statute, M.G.L. c. 272, § 99(C) ("Section 99"). Section 99 is facially overbroad because it criminalizes a substantial amount of protected speech relative to its legitimate applications, and it does so in a way that directly burdens the creation of speech on matters of public concern. Section 99 is further invalid as applied to PETA's surreptitious creation of audiovisual recordings that document unlawful treatment of animals in workplaces where animals are used for food production, clothing production, entertainment, experimentation, or bred or sold as companion animals. As Section 99 violates the First Amendment of the U.S. Constitution, PETA seeks declaratory and injunctive relief pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201 *et seq*.

2.      Massachusetts General Laws Chapter 272, Section 99—commonly known as the Massachusetts Wiretap Statute—is one of the broadest and most restrictive wiretap laws in the United States. Enacted in 1968 to combat organized crime, it now functions primarily as an all-party consent law, criminalizing the nonconsensual recording of oral communications in nearly all circumstances.

3.      Under Section 99(C)(1), it is a felony for "any person"—a term that includes individuals, partnerships, associations, and corporations—to willfully commit, attempt to commit, or procure another to commit an "interception" of any wire or oral communication. The statute defines "interception" in Section 99(B)(4) as secretly hearing or secretly recording the contents of any wire or oral communication through the use of an "intercepting device," without prior authority from all parties to the communication. An "oral communication," as defined in Section 99(B)(2), includes any spoken words, except for those transmitted over public airwaves (*e.g.*, via radio).

4.      Notably, the statute does not limit its prohibitions to situations where a party has a reasonable expectation of privacy—meaning that it applies even in public or non-private settings, and regardless of whether the recorded conversation pertains to a matter of public concern. Section 99 thus criminalizes a wide range of modern speech-creating activities, including surreptitious audio documentation by journalists, whistleblowers, advocates, and investigators.

5.      For decades, PETA's undercover investigations have exposed cruel mistreatment of animals—including egregious violations of animal welfare laws and regulations—in workplaces like factory farms, slaughterhouses, animal testing laboratories, roadside zoos, and breeding facilities. Dozens of national press outlets have featured audiovisual recordings created during these investigations. PETA's recordings have served as crucial evidence in enforcement

- 2 -

actions brought by federal, state, and local government agencies. They have sparked widespread debate about American society's use of animals and, in some instances, have led to the enactment of more restrictive laws intended to protect animals. They have also inspired countless individuals to forswear the consumption of products made through animal exploitation.

6.     PETA has imminent plans to conduct similar undercover investigations in the Commonwealth of Massachusetts, including Hampden County. However, due to a reasonable fear of prosecution under Section 99, including prosecutions in Hampden County itself, PETA is chilled from creating the sorts of undercover audiovisual recordings that are indispensable to its mission, and have prompted nationwide press coverage, public outcry, and government action.

7.     Section 99 prohibits *all* secretly captured audio recordings—even recordings concerning matters of the utmost public concern, recordings that are captured secretly in circumstances where open recording would threaten the recorder's physical safety, recordings that merely capture isolated intelligible words, and recordings captured in places where individuals have no expectation of privacy. Given this incredible sweep, PETA's undercover investigators are chilled from recording uniquely reliable evidence of unlawful conduct. This includes conversations about animal treatment practices—such as refusals to provide adequate veterinary care—which are often essential to documenting an investigation subject's knowledge of illegality. Similarly, PETA is chilled from recording the sounds animals make—including indicators of stress, like vocalizations and labored respiration—whenever humans are present, as capturing even a single human utterance would expose PETA to criminal liability.

8.     This chilling effect comes at an incredible cost. Without accompanying audio, visual recordings are shorn of crucial context—and prone to distortion or mischaracterization. For instance, a video depicting physical handling of an animal may initially appear innocuous but be

rightfully understood as documenting inhumane treatment once an animal's distressed cries can be heard. In many of PETA's recordings, audio is necessary to help viewers make sense of the visuals.

9.    Section 99's application to PETA's creation of undercover audio recordings is unconstitutional. Courts across the country—including this Circuit—have held that the First Amendment protects the creation of audio recordings on matters of public concern. *See, e.g.*, *PETA v. N. Carolina Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 829 (4th Cir. 2023); *Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1228 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 2647 (2022); *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021); *Project Veritas Action Fund v. Rollins*, 982 F.3d 813, 832 (1st Cir. 2020), *cert. denied*, 142 S. Ct. 560 (2021)[1]; *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018); *Fields v. City of Philadelphia*, 862 F.3d 353, 358 (3d Cir. 2017); *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). And courts have recognized this right in nonpublic areas of workplaces, including where animals are used for food production and experimentation. *See, e.g.*, *PETA*, 60 F.4th at 833; *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1209 (D. Utah 2017).

10.    PETA therefore seeks a declaration that Section 99 is unconstitutional on its face and as applied to its creation of undercover audio recordings of animal mistreatment and conversations about the same in nonpublic portions of workplaces where animals are used for food production, clothing production, entertainment, experimentation, or bred or sold as companion

---

[1] In *Rollins*, the court explicitly invalidated Section 99 as applied to secret recordings of police officers in public places. 982 F.3d at 837.

animals.[2] PETA also seeks a permanent injunction in the form of an order enjoining Defendants

from enforcing Section 99 against the now-prohibited speech creation.

## JURISDICTION AND VENUE

11.    This action arises under the U.S. Constitution and laws of the United States,

including 42 U.S.C. §§ 1983 and 1988. This Court has subject matter jurisdiction pursuant to 28

U.S.C. §§ 1331 and 1343.

12.    This court has authority to issue declaratory and injunctive relief pursuant to 28

U.S.C. §§ 2201 and 2202.

13.    Venue is proper in the U.S. District Court for the District of Massachusetts pursuant

to 28 U.S.C. § 1391(b).

## PARTIES

14.    Plaintiff PETA is a nonprofit animal rights organization based in Norfolk, Virginia.

Founded in 1980, PETA is dedicated to establishing and defending the rights of all animals. PETA

undertakes these efforts through public education, undercover investigations, research, animal

rescue, direct advocacy to government agencies and legislators, protest campaigns, and lawsuits

to enforce laws enacted to protect animals. PETA has imminent plans to conduct additional

---

[2] The *Rollins* court stressed that as-applied challenges must be accompanied by a degree of "congruence" between the plaintiff's intended conduct and the relief sought. *Id.* at 841-42. Here, PETA's complaint meets that standard by identifying specific categories of speech (i.e., audio recordings of animal mistreatment and related conversations) and particular settings (i.e., nonpublic areas of animal-use facilities in Massachusetts). This targeted approach is precisely the kind of factual and legal specificity that *Rollins* found lacking in the overbroad request presented there. *See also ACLU of Illinois v. Alvarez*, 679 F.3d 583, 586–88 (7th Cir. 2012) (upholding a narrowly tailored as-applied challenge to a similar eavesdropping law).

undercover investigations in the Commonwealth of Massachusetts, and to surreptitiously create audiovisual recordings documenting evidence of animal mistreatment as a part of those investigations but is chilled from doing so because it fears criminal liability under Section 99.

15.    Defendant Andrea Joy Campbell is the Attorney General of the Commonwealth of Massachusetts. In this capacity, she serves as the chief law enforcement officer of the Commonwealth, is required to take cognizance of all violations of the law affecting the general welfare and is responsible for enforcing and ensuring compliance with state law. She may do so by many methods, including advising district attorneys in matters relating to their duties, exercising supervisory authority over all district attorneys, taking charge of cases that are being handled by district attorneys, and otherwise interchanging official duties with district attorneys. *See* M.G.L. c. 12, §§ 6, 10 and 27; *Com. v. Kozlowsky*, 238 Mass. 237, 389 (1921). She is sued solely in her official capacity.

16.    Defendant Anthony D. Gulluni is the Hampden County District Attorney. In this capacity, he is charged with enforcing criminal laws within his jurisdiction. *See* M.G.L. c. 12, § 6. He is sued solely in his official capacity.

## GENERAL ALLEGATIONS

## I.    PETA's Undercover Investigations Have Exposed Unlawful Animal Abuse, Prompting Nationwide Media Coverage, Public Debate, and Government Action

17.    PETA has a long history of conducting undercover investigations to expose cruelty to animals. PETA's first undercover investigation—the 1981 investigation of Dr. Edward Taub's monkey testing laboratory in Silver Spring, Maryland—resulted in the nation's first arrest and criminal prosecution of an animal experimenter for cruelty to animals.

18.    Ever since that investigation, among PETA's most effective forms of advocacy has been confronting the public with evidence of cruelty to animals. By capturing and disseminating this evidence, PETA can build support for enforcing existing animal welfare laws, advancing additional legal protections, and encouraging private and public actors to adopt more humane practices.

19.    To further this mission, PETA has conducted dozens of employment-based undercover investigations across the country at facilities engaged in cruelty to animals. Typically, PETA investigators seek out positions at facilities PETA has reason to believe are engaging in unlawful treatment of animals. Investigators use their real names to obtain at-will positions at those facilities. In conducting investigations, PETA's investigators act in compliance with all laws, carry out all lawful duties assigned to them by the facility, and conduct themselves as model employees in doing so.

20.    While employed at the facilities, investigators seek to gather information from public and non-public areas regarding the facilities' treatment of animals. If an investigator observes unlawful conduct, they are authorized to begin lawfully recording that conduct so that PETA can evaluate the behavior, expose it, and build public pressure for change. Such conduct includes: violations of state cruelty-to-animal laws; violations of federal animal welfare laws, such as the Animal Welfare Act ("AWA"), Endangered Species Act ("ESA"), and the Humane Methods of Slaughter Act ("HMSA"); and violations of regulations promulgated pursuant to these and other laws. In addition, as legally permissible, investigators may record conversations with facility employees and supervisors concerning relevant animal treatment practices, including denials of adequate veterinary care, shelter, sustenance, and enrichment. At the conclusion of an investigation, PETA typically presents evidence of any illegal conduct to the proper federal, state,

or local authorities. PETA also typically releases evidence of any unlawful treatment of animals to the public through news articles, blog posts, videos, and press releases.

21.    In addition to its centrality to PETA's animal protection mission, PETA's investigations exposing unlawful conduct vindicate thoroughly established public interests. *See, e.g.*, 16 U.S.C. § 1531(a)(5) (finding that the ESA's protections are "key to meeting the Nation's international commitments and to better safeguarding, for the benefit of all citizens, the Nation's heritage in fish, wildlife, and plants").

22.    The public interest in vindicating these interests outweighs any government interest in prohibiting surreptitious creation of audiovisual recordings. For example, by publicly exposing unlawful conduct that facility owners, operators, and supervisors have kept from public view, PETA's undercover investigations have led to significant policy changes and enforcement actions and impacted the public's views on animal rights.

23.    One recent example is PETA's 2021 undercover investigation at the Envigo RMS, LLC ("Envigo") facility in Cumberland, Virginia, where beagles were bred for use in laboratory experiments. At that facility—where thousands of beagles were kept in squalid conditions, resulting in hundreds of puppy deaths—a PETA investigator captured audiovisual recordings documenting, among other horrifying events: a puppy crying out loudly as a facility supervisor inserted a needle into the puppy's head, without anesthetics or analgesics, in a crude attempt to drain fluid from a wound; soaking wet puppies whimpering after a supervisor sprayed them with a high-pressure hose; the deafening sound of barking dogs trapped in cages without any enrichment; and a supervisor stating in conversation that nursing dogs "did not get fed" during their final days with their puppies, in clear violation of United States Department of Agriculture ("USDA") instructions.

24.     Based on this evidence, a team of USDA officials conducted inspections at the facility and cited Envigo for dozens of violations of the AWA. After USDA failed to take further enforcement action, the Department of Justice filed a lawsuit against Envigo, ultimately resulting in a court order to remove all dogs from the facility.

25.     Media outlets like the *New York Times* covered the subsequent collaboration between federal authorities and animal welfare organizations to rescue beagles from the Envigo facility, often highlighting the critical role played by PETA's undercover investigation. And Virginia policymakers responded to overwhelming public outrage over Envigo's misconduct—and PETA's documentation of that misconduct—by enacting five new state laws extending legal protection to dogs bred for use in laboratory experiments.

26.     The Envigo investigation was typical of PETA's undercover investigations in several respects. As demonstrated by the recordings PETA published at the conclusion of its investigation, PETA's investigator only recorded where they were lawfully present. Likewise, as is similarly apparent, the investigator did not record in any places where facility supervisors or workers engaged in intimate or private behavior. Finally, the investigator only made audiovisual recordings of what they believed to be unlawful conduct or conditions, as well as conversations about the same.

27.     In these ways, PETA's undercover investigation recordings have narrowly focused on capturing direct evidence of unlawful treatment of animals. This targeted approach has yielded highly effective audiovisual documentation necessary to fulfill PETA's advocacy mission.

28.     Yet PETA's impactful investigation exposing widespread cruelty to animals at Envigo would be criminal in Massachusetts under Section 99.

II.    **Secretly Captured Audio Recordings Are Essential to the Success of PETA's Undercover Investigations**

29.    PETA's ability to secretly capture audio recordings is core to the efficacy of its undercover investigations for multiple reasons. First, undercover investigations occur in settings where investigators would fear physical harm and retaliation if required to engage in open recording. Second, recorded conversations about animal treatment practices may evidence knowledge of illegality, and such documentation is unlikely to occur if facility supervisors or workers know they are being recorded. Finally, PETA's investigators secretly capture audio recordings of the sounds animals make when they are treated inhumanely—including vocalizations and other indicators of physiological and psychological distress—because such recordings constitute crucial evidence of unlawful animal treatment.

### A. PETA's Investigators Would Fear Physical Harm and Retaliation if Required to Openly Record Evidence of Unlawful Animal Abuse

30.    PETA's undercover investigators undertake significant risks when documenting cruelty to animals. As PETA's past experiences have shown, if an investigator's identity is compromised, they may face threats of physical harm or other retaliation. For this reason, PETA undertakes steps to protect its investigators' identities, including by advising them to capture audiovisual recordings secretly when legally permissible.

31.    Often, investigators are tasked with uncovering abuses in industries that are notorious for violence against animals and humans. For example, PETA has conducted undercover investigators at dismal roadside zoos, leading to the rescue of numerous exotic animals. *See, e.g.*, *PETA v. Wildlife in Need and Wildlife In Deed, Inc. ("WIN")*, Case No. 4:17-cv-00186 (S.D. Ind. Sept. 15, 2020), Dkt. 414 (approving transfer of multiple big cats from an abusive roadside zoo, Wildlife in Need, to reputable sanctuaries following a PETA undercover investigation and

successful ESA lawsuit). But this is dangerous work, given the well-documented link between industries such as the illegal wildlife trade and the roadside zoo industry and other criminal behavior. This link has been borne out in PETA's work, as subjects of PETA undercover investigations have subsequently been charged with committing violent criminal offenses.

32.    PETA's Wildlife In Need undercover investigation exemplifies the risks investigators face. There, after learning of the existence of an undercover investigator, Wildlife in Need and its proprietors guessed and published the undercover investigator's identity—as well as their personal address and a photocopy of their driver's license—on Facebook. *WIN*, Dkt. 156 at 2. In the same post, Wildlife in Need called the undercover investigator a "terrorist" and claimed it was important that others "become aware of who he is." *Id*. Within hours, the Facebook post was shared hundreds of times, and many comments on the post contained threats of violence against the investigator. *Id*. One commenter menacingly wrote that "maybe an example needs to be made out of said terrorist. 187." *Id*. Another commenter explained that "187" is slang for "murder." *WIN*, Dkt. 156-1 at 8.

33.    Further underscoring the necessity of secrecy are instances when PETA investigators have faced acts of retaliation after openly recording unlawful animal abuse. PETA's investigation into Tri-State Zoological Park of Western Maryland, Inc. ("Tri-State") is particularly illustrative. In that case, after PETA investigators openly recorded evidence of unlawful animal abuse, PETA successfully sued the "fetid and dystopic" roadside zoo for egregious violations of the ESA, ultimately resulting in the transfer of 65 animals to reputable sanctuaries and zoos. *See PETA v. Tri-State Zoological Park of W. Maryland, Inc*., 424 F. Supp. 3d 404, 408 (D. Md. 2019), aff'd, 843 F. App'x 493 (4th Cir. 2021). But on the eve of trial, in an act of retaliation, the roadside zoo's proprietor "purposely misled the [Maryland] state court system to obtain [felony] criminal

charges against" the PETA investigators who had openly recorded evidence of unlawful animal abuse, requiring those investigators to secure criminal defense counsel and spend months fighting frivolous charges. *See Tri-State*, Case No. 1:17-cv-02148-PX (D. Md. Nov. 14, 2019), Dkt. 218 at 2-3. Recognizing this retaliation as an abuse of process, state authorities eventually dropped all charges, and a federal court ordered sanctions against the roadside zoo proprietor. *See id*.

34.    Given the reasonable fear that disclosure of their identities will lead to threats of violence or acts of retaliation, PETA's undercover investigators endeavor, whenever possible, to safeguard their anonymity—including by secretly documenting evidence of unlawful animal abuse.

**B. Secretly Recorded Conversations About Animal Treatment Practices Establish Knowledge of Illegality**

35.    Recorded audio of conversations is some of the most reliable evidence of unlawful conduct collected by PETA undercover investigators. These often self-authenticating recordings— which document, among other things, facilities' cultures of abuse or decisions to refuse vital veterinary care—are uniquely powerful demonstrations of facility operators' culpable states of mind. Often, they are the only way to definitively establish that facility owners and managers— and not simply individual workers—bear responsibility for mistreatment of animals.

36.    In many cases, these audio recordings have made a critical difference when authorities have sought accountability for cruelty to animals in the wake of a PETA investigation. Take, for example, PETA's 2008 investigation into an Iowa pig farm that bred piglets for Hormel, a major food processing firm. In that case, an undercover investigator secretly captured facility supervisors making statements that demonstrated extreme malice towards abused pigs, including: a supervisor telling PETA's investigator, "You gotta beat on the bitch [and] [m]ake her cry," as he

kicked a young pig in the face, abdomen, and genitals; and a worker telling PETA's investigator that pigs "deserve to be hurt" and that it was appropriate to "take out your frustrations on 'em." After PETA shared these recordings with the local county sheriff, the farm's manager and five workers were charged with and admitted guilt to criminally neglecting and abusing livestock. These were the first-ever convictions for abuse and neglect of factory-farmed animals in Iowa, the nation's leading pig-raising state.

37.    Another example is PETA's 2010–2011 investigation into Sacred Vision Animal Sanctuary (SVAS), where approximately 300 cats were kept in filthy, stifling hot, disease-ridden storage units near Myrtle Beach, South Carolina. There, PETA's undercover investigator secretly captured audiovisual recordings of SVAS operator Elizabeth Owen acknowledging animals' severe illnesses, her refusals to obtain adequate veterinary care for them, and her discussion of county officials' lackluster inspections of her property. After reviewing this evidence, a judge ordered the removal of all the animals from the facility, which subsequently shut its doors.

38.    Courts have acknowledged that such secret recording may be the only viable way to document this uniquely credible evidence of wrongdoing. The First Circuit, for example, has recognized that secret recording "may best ensure that [recording] occurs at all, given" the "resistance" generated by "open recording." *Project Veritas*, 982 F.3d at 833.

39.    In the context of PETA's investigations, the stakes are high. Indeed, where PETA undercover investigators have been unable to secretly capture audio recordings of damning conversations, PETA has been unable to present authorities with some of the most compelling evidence of wrongdoing. For instance, when PETA investigated Primate Products, Inc. ("PPI")— a Florida-based primate dealer that violently handled monkeys destined for laboratory experiments—the investigator was prevented from secretly recording regular conversations they

had with supervisors about sick and injured animals who were denied necessary veterinary care. While, as a result of PETA's investigation, the USDA cited PPI for at least 25 violations of animal welfare regulations, no further enforcement action was taken by either federal or local authorities, who could not benefit from direct audio evidence of neglect and cruelty.

40.     Secretly captured recordings of conversations are thus crucial to successful outcomes from PETA's investigations. They can be the difference between a slap-on-the-wrist agency warning and a meaningful (and precedent-setting) enforcement action. For this reason, whenever legally permissible, PETA investigators have endeavored to obtain this indispensable evidence.

### C. Secretly Captured Audio Recordings of Animals in Distress Are Also Critically Important to PETA Investigations

41.     Audio recordings of the sounds animals make when they are inhumanely treated or handled by facility employees similarly constitute critical evidence of wrongdoing. By necessity, PETA investigators capture these recordings when facility supervisors or workers are present to document direct evidence of physical and psychological harms.

42.     Governmental and veterinary medical institutions agree that animals' sounds are particularly important indicators of distress. For instance, in its *Guide for the Care and Use of Laboratory Animals*, the National Research Council of the National Academies recognizes that "species-specific behavioral manifestations," including "vocalization" and "rapid or labored respiration," are used as indicators of "unacceptable levels" of "pain or distress" in laboratory settings. The American Veterinary Medical Association's ("AVMA") *Guidelines for the Euthanasia of Animals: 2020 Edition* similarly explains that "conscious animals" "respon[d] to noxious stimuli" with "distress vocalization[s]." Specifically, with respect to "cattle and pigs," the

AVMA Guidelines note that "vocalization during handling or painful procedures is associated with physiologic indicators of stress." The AVMA Guidelines further explain that "[v]ocalization is associated with excessive pressure applied by a restraint device."

43.    Veterinarians routinely rely upon evidence of the sounds animals make to reach conclusions about whether certain treatment or handling is unlawful. *See, e.g.*, January 18, 2023 Letter from 10 Veterinarians to the AVMA, available at https://drive.google.com/file/d/1nQ-ycScI3zvNLaH8dJQgE_4BAneWvCDX/view (concluding, based on audio recordings, that the use of a $CO_2$ gas chamber in a pig slaughterhouse likely violated the Humane Slaughter Act and California animal cruelty laws because the recording captured "numerous loud [pig] screams," which "indicates many [pigs] are experiencing an unacceptable level of distress during the whole process").

44.    For these reasons, whenever possible, PETA investigators have endeavored to document the sounds that animals make when they are inhumanely handled, restrained, or otherwise abused in workplaces. Such evidence has often been indispensable to the efficacy of PETA undercover investigations. One example is PETA's 2010 undercover investigation of Professional Laboratory and Research Services, a North Carolina facility that tested insecticides and other chemicals on dogs and cats. There, PETA's undercover investigator secretly documented dogs loudly barking while caged without enrichment, as well as the sounds of distress animals made while being unlawfully handled by laboratory supervisors and workers. This included whimpers of pain made by a dog whose teeth were pulled out with a pair of pliers after receiving an out-of-date anesthetic. After PETA submitted this evidence to USDA in the form of an official complaint, the agency cited the facility for dozens of violations of federal animal welfare laws. The facility ultimately surrendered nearly 200 dogs and more than 50 cats and shut its doors.

45.     Similarly illustrative is the 2008 Iowa pig farm investigation highlighted above. In addition to documenting conversations that evidenced facility supervisors' malice towards animals, PETA's investigators documented numerous sounds of distress, including the screams of piglets who, without receiving any painkillers, were castrated and had their tails cut off. As memorably described in *The Chain: Farm, Factory, and the Fate of our Food*—investigative journalist Ted Genoways' book-length exploration of the disturbing realities of modern factory farms—"the piglets' screeching during those procedures was so loud that workers wore earplugs to protect their hearing." Genoways further noted that an Associated Press story featuring PETA's undercover recordings of piglets at the Iowa farm "became worldwide news instantly."

46.     As with secretly captured conversations, a PETA investigator's inability to capture audio recordings of animals' sounds has had dire consequences. During a 2021 investigation of a Michigan dog breeder, for example, PETA's investigator was prevented from capturing audio recordings of puppies crying in pain while their tails and dewclaws were cut off without anesthetics. Without the benefit of this powerful evidence, a jury acquitted the breeder in question of cruelty charges.

47.     Audio recordings of animal sounds are thus essential to furthering PETA's advocacy mission. By necessity, these recordings must be captured when humans are present, thus raising the risks to investigators' safety highlighted above—and requiring surreptitious recording.

## III.    Section 99 Prohibits All Secretly Captured Audio Recordings

48.     In 1968, the Massachusetts General Court passed Section 99 to criminalize secret audio recordings of oral communications.

49.     Section 99 arose from the work of a Special Commission on Electronic Eavesdropping. After holding public hearings and executive sessions, the Special Commission

concluded in a June 1968 Report "that there is no way to effectively prohibit the[] sale or manufacture of electronic eavesdropping devices." In light of this finding, the Special Commission recommended revising Massachusetts law "to strictly forbid electronic eavesdropping . . . by members of the public."

50.    Two commissioners wrote to concur with this legislative recommendation. The commissioners explained their view that "the 'all-party consent' provision [of Section 99] is the essence of any protection which the law can afford the public." They rejected a "one-party consent" standard, explaining their fear that, should secret recording remain lawful, utterances said "in jest, with a wink, for its shock value on [a] conversational partner, or to test some belief held by [another] party, [could] be produced in evidence . . . with all the impact on the grand or petit jury, that we know such a tape recording exerts." The commissioners also concluded that Section 99, alongside other provisions in the Wiretap Statute, would "protect the privacy of the individual while providing law enforcement agencies with the tools they feel are necessary in this technological era."

51.    Nothing in this legislative history indicates that the Massachusetts General Court weighed—or even noted—the First Amendment-protected interest in creating audio recordings. Nor is there any indication that the General Court considered any alternative measures that would have been less burdensome on speech creation than the recommended total ban on secret recording.

52.    As codified, Section 99 imposes up to five years' incarceration and a fine of up to ten thousand dollars on "any person," including any "partnership, association, . . . or corporation," "who willfully commits an interception, attempts to commit an interception, or procures any other person to commit an interception or to attempt to commit an interception" of any "oral communication." M.G.L. c. 272, § 99(C)(1).

53.    Section 99 defines the term "interception" as follows: "to secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." M.G.L. c. 272, § 99(B)(4).

54.    Section 99 similarly imposes felony liability on any person who "permits," "participates in a conspiracy to commit," or serves as "an accessory to a person who commits" an interception of an oral communication. M.G.L. c. 272, § 99(C)(6).

55.    This sweeping criminal restriction has been construed broadly by Massachusetts courts. The Supreme Judicial Court of Massachusetts has read Section 99 "strictly to prohibit all secret recordings by members of the public . . . when made without [] permission or knowledge." *Commonwealth v. Hyde*, 434 Mass. 594, 599-600 (2001). Massachusetts appellate courts have held that Section 99 imposes liability even when recordings capture only isolated intelligible words. *See, e.g.*, *Commonwealth v. Wright*, 61 Mass. App. Ct. 790, 794 (2004).

## IV.    Section 99 Has Chilled PETA from Engaging in First Amendment-Protected Activity

56.    In recent years, the Commonwealth of Massachusetts has repeatedly brought charges or prosecution pursuant to Section 99 involving alleged secret audio recording. *See, e.g.*, *Hyde*, 434 Mass. at 596; *Commonwealth v. Manzelli*, 68 Mass. App. Ct. 691, 692-693 (2007); *Damon v. Hukowicz*, 964 F. Supp. 2d 120, 139 (D. Mass. 2013); *Commonwealth v. Hennessey*, 98 Mass. App. Ct. 1106, *1 n.2 (2020) (Table). There have been numerous prosecutions under Section 99(c)(1) in Hampden County alone. *See, e.g.*, 2344CR000439 (2023), 2344CR001510 (2023), 2220CR001503 (2022), 2244CR001360 (2022), 2123CR006359 (2021), 2144CR000672 (2021), 1823CR007469 (2018).

57.     In 2020, the First Circuit concluded that Section 99 is not "moribund" and noted that officials charged with its enforcement, including a District Attorney, had not claimed "that it simply will not be enforced." *Project Veritas*, 982 F.3d at 829.

58.     Neither Defendant to this action has disavowed enforcement of Section 99.

59.     PETA, through its undercover investigators, is prepared and imminently intends to surreptitiously capture audio recordings during undercover investigations conducted in the Commonwealth of Massachusetts. For instance, PETA plans to investigate a facility located in Hampden County.

60.     But for the reasonable threat of prosecution by Defendants under Section 99, PETA would authorize its investigators to create undercover audio recordings of conversations and animal sounds at this facility, as well as other Massachusetts workplaces where animals are used for food production, clothing production, entertainment, experimentation, or bred or sold as companion animals.

61.     Section 99, by preventing PETA from capturing this uniquely reliable and powerful evidence of unlawful treatment of animals, substantially frustrates PETA's mission of building support for enforcing existing animal welfare laws, advancing additional legal protections, and encouraging private and public actors to adopt more humane policies and practices. As highlighted above, Section 99 deprives PETA of its most effective mode of communication to government officials, law enforcement agents, private actors, and members of the public, and so frustrates the public's interests in a manner that outweighs any government interest in prohibiting surreptitious creation of audiovisual recordings.

## CLAIMS FOR RELIEF

### Violation of the First Amendment of the U.S. Constitution

**U.S. Const. amend. I, amend. XIV; 42 U.S.C. § 1983; Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202**

### <u>First Cause of Action</u>
### First Amendment
### (Facial Overbreadth)

62.     PETA incorporates by reference all prior allegations of this Complaint.

63.     The First Amendment protects one's right to create audio recordings on matters of public concern. *See e.g.*, *Project Veritas*, 982 F.3d at 832.

64.     Section 99's "blunderbuss prohibitory approach"—that is, its "total ban" on all such speech creation—is "too unqualified to be justified in the name of protecting [the] degree of privacy" enjoyed by individuals in all circumstances. *Id.* at 839; *see also PETA*, 60 F.4th at 833 (citing *Desnick v. Am. Broad. Cos., Inc.*, 44 F.3d 1345, 1353 (7th Cir. 1995)).

65.     Section 99's wide-sweeping applicability chills the constitutionally protected creation of audio recordings on matters of public concern.

66.     Plaintiffs are entitled to a declaratory ruling that Section 99 is unconstitutional as facially overbroad and an injunction preventing Defendants from enforcing it.

67.     This will cure the law's chilling effect on the creation of speech.

68.     PETA has no other adequate remedy at law.

**Second Cause of Action**
**First Amendment**
**(As Applied)**

69.     PETA incorporates by reference all prior allegations of this Complaint.

70.     The First Amendment protects PETA's right to create audiovisual recordings documenting animal mistreatment in nonpublic spaces of workplaces where animals are used for food production, clothing production, entertainment, experimentation, or bred or sold as companion animals.

71.     Even if the Court were to determine the statute can survive facially, Section 99 is at least unconstitutional as applied to PETA's planned investigative and newsgathering activities. PETA makes recordings to educate law and policymakers, law enforcement and the public about matters of public concern involving the illegal abuse and neglect of animals, which makes PETA's recordings protected speech.

72.     Thus, PETA is entitled to a declaratory ruling that Section 99 cannot be enforced against it concerning PETA's investigative and newsgathering activity, and to an injunction preventing Defendants from enforcing it against PETA.

73.     Such relief will cure the law's chilling effect on PETA's speech and the First Amendment harm it is suffering.

74.     PETA has no other adequate remedy at law.

- 21 -

**PRAYER FOR RELIEF**

Plaintiff prays for relief as follows:

1.       Declare that Massachusetts General Laws c. 272, § 99 is facially unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution;

2.       Declare Section 99 unconstitutional as applied to PETA's secret creation of audio recordings documenting animal mistreatment and conversations about the same in non-public portions of workplaces where animals are used for food production, clothing production, entertainment, experimentation, or bred or sold as companion animals;

3.       Permanently enjoin Defendants, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them, from prosecuting PETA under Section 99 for its secret creation of audio recordings documenting animal mistreatment and conversations about the same in non-public portions of workplaces where animals are used for food production, clothing production, entertainment, experimentation, or bred or sold as companion animals;

4.       Award reasonable costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

5.       Order any other such relief as this Court deems just.

February 2, 2026

Respectfully submitted,

*/s/ Alexandra H. Deal*
Alexandra H. Deal
BBO No. 660645
Paik Deal, LLP
6 Beacon Street, Suite 815
Boston, MA 02108
(617) 439-0150
adeal@paikdeal.com

Aaron Frazier*
Foundation to Support Animal Protection (PETA Foundation)
501 Front Street
Norfolk, VA 23510
(757) 622-7382
AaronF@PetaF.org
Counsel for People for the Ethical Treatment of Animals, Inc

Chris Carraway*
The Animal Activist Legal Defense Project at the University of Denver Sturm College of Law
2255 E. Evans Ave., Denver, CO 80210
Chris.Carraway@du.edu
(919) 272-1295

*Counsel for Plaintiffs*

*Pending *Pro Hac Vice* Admission