**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:26-cv-10513-GAO |
| ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; ANTHONY D. GULLUNI, in his official capacity as Hampden County District Attorney, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**Preliminary Statement**

Plaintiff, the People for the Ethical Treatment of Animals, Inc. (PETA), regularly conducts undercover investigations that expose and document criminal animal mistreatment. For these investigations, an investigator is often hired to work at a factory farm, slaughterhouse, roadside zoo, animal laboratory, or similar facility and records what they see and hear: criminal animal mistreatment and conversations about the same. Compl. ¶¶ 19-20. These audio recordings are critical to the efficacy of PETA's investigations, which have been crucial in exposing abuse, led to prosecutions, and changed the law. *Id.* at ¶¶ 5, 35-47. The information they uncover is truthful, important, and directly tied to matters of public concern.

PETA intends to conduct similar undercover investigations in Massachusetts, specifically in Hampden County, but has refrained due to a credible fear of prosecution under M.G.L. c. 272, § 99 ("Section 99"), which broadly criminalizes nonconsensual audio recording. *Id.* at ¶¶ 59-60. PETA brings this pre-enforcement challenge alleging that 1) Section 99 is unconstitutional as-

applied to PETA's planned investigative and newsgathering activities, *id.* at ¶¶ 71-72; and 2) Section 99 is facially overbroad insofar as it prohibits all secret recordings on issues of public concern, *id.* at ¶¶ 65-67. Concerning its as-applied challenge, PETA asks this Court to permanently enjoin the Defendants from prosecuting PETA under Section 99 for its secret creation of audio recordings documenting animal mistreatment and conversations about the same in non-public portions of workplaces where animals are used for food production, clothing production, entertainment, experimentation, or bred or sold as companion animals. *Id.* at 22, ¶¶ 2-3.

Defendants move to dismiss for lack of standing and ripeness. ECF No. 14 at 1-2. But their motion rests on an unprecedented theory of pre-enforcement review: that a plaintiff challenging a speech-restrictive criminal statute must identify, in advance, the precise place, date, conversation, and recording that could trigger prosecution before seeking judicial review. No court has imposed such a requirement—particularly in the First Amendment context, where pre-enforcement review exists precisely to prevent speakers from having to choose between self-censorship and criminal prosecution. Defendants' position would effectively insulate Section 99 from meaningful constitutional review.

The jurisdictional questions here are straightforward. PETA intends to imminently engage in constitutionally protected newsgathering and recording activity in Massachusetts, including in Hampden County. Section 99 criminalizes that activity. And PETA is presently chilled from engaging in it because of a credible threat of enforcement. That is more than sufficient to establish standing and ripeness for a pre-enforcement First Amendment challenge.

**Argument**

PETA's standing allegations—that it is refraining from intended, constitutionally-protected undercover newsgathering investigative activity in Hampden County but for the unconstitutional threat of prosecution under Section 99—easily suffice under decades of binding and persuasive precedent. Courts have repeatedly and emphatically rejected Defendants' proposed standard, which would impose pleading requirements encouraging exactly the type of First Amendment chill that well-established doctrine exists to prevent. Because the law does not require PETA to choose between self-censorship and waiting to be prosecuted in violation of the First Amendment, this Court should deny Defendants' motion to dismiss.

## I.    Standing

*a. PETA has standing to bring its as-applied challenge because there is a credible threat that Section 99 will be enforced against their constitutionally protected activity.*

PETA has plausibly alleged an injury sufficient to establish Article III standing. To establish standing, a plaintiff must show "(1) he or she personally has suffered some actual or threatened injury as a result of the challenged conduct; (2) the injury can fairly be traced to that conduct; and (3) the injury likely will be redressed by a favorable decision from the court." *New Hampshire Right to Life Political Action Committee v. Gardner*, 99 F.3d 8, 13 (1st Cir. 1996). At this stage, a court must take the complaint's well-pleaded facts as true and indulge all reasonable inferences in the plaintiff's favor. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730 (1st Cir. 2016). Here, Defendants only argue a lack of injury.[1] But PETA clearly alleges a concrete intent

---

[1] Causation and redressability are not legitimately at issue. The chilling of PETA's constitutionally protected activity stems directly from Defendants' threat of enforcement against them. *See Martin v. Evans*, 241 F. Supp. 3d 276, 283 (D. Mass. 2017). PETA's injury is redressable: "[W]hen a plaintiff seeks a declaration that a particular statute is unconstitutional, the proper defendants are the government officials charged with administering and enforcing it." *New Hampshire Right to Life,* 99 F.3d at 13.

to engage in undercover investigative activity in Massachusetts and asserts that it has refrained from doing so because of a credible fear of prosecution under Section 99.  Compl. ¶¶ 6-8. PETA's allegations are not hypothetical. PETA has a long history of conducting materially similar investigations throughout the country. *Id*. at ¶¶ 17-19, 23-27, 30-33, 36-39. Defendants do not dispute that PETA's proposed conduct falls within Section 99's prohibition on nonconsensual audio recording. Nor have Defendants disavowed enforcement against PETA if it engages in the planned investigations described in the Complaint.

Under settled First Circuit precedent, when an alleged injury is a chill on constitutionally protected First Amendment activity, the concrete injury threshold is satisfied by a credible threat of present or future prosecution. *See New Hampshire Right to Life*, 99 F.3d at 14 ("as long as a credible threat of prosecution exists, a litigant has standing to mount a pre-enforcement challenge"). This has been re-affirmed repeatedly by other circuits too, including in the context of undercover investigations by PETA and other animal advocacy organizations. *See, e.g., Animal Legal Defense Fund v. Reynolds*, 89 F.4th 1071, 1077 (8th Cir. 2024). *Accord People for Ethical Treatment of Animals, Inc. v. Reynolds*, No. 25-1750, 2026 WL 1100432, at \*3 (8th Cir. Apr. 23, 2026). As explained by the First Circuit, the injury requirement is satisfied when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the] statute, and there exists a credible threat of prosecution." *New Hampshire Right to Life*, 99 F.3d at 14; *accord Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citing *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "[T]he bottom line is that, as long as a credible threat of prosecution exists, a litigant has standing to mount a pre-enforcement challenge to the facial constitutionality of a statute on the basis that her First Amendment rights arguably are being trammeled." *New Hampshire Right to Life*, 99 F.3d at

14. A party need not subject itself to prosecution to establish standing. *Mangual v. Rotger-Sabat*, 317 F.3d 45, 56 (1st Cir. 2003) (citing *Babbitt*, 442 U.S. at 298).

There is no dispute that PETA has adequately alleged a chill to its First Amendment rights. Audiovisual recording is core expressive activity. *See Burstyn v. Wilson*, 343 U.S. 495, 502 (1952) (audio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas and thus are "included within the free speech and free press guaranty of the First and Fourteenth Amendments."); *cf. Project Veritas v. Rollins*, 982 F.3d 813, 833 (1st Cir. 2020); *Animal Legal Defense Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018); *Western Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) ("An individual who photographs animals or takes notes about habitat conditions is creating speech in the same manner as an individual who records a police encounter."); *Am. C.L. Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). Courts have recognized this right in nonpublic areas of workplaces, including where animals are used for food production and experimentation. *See, e.g.*, *PETA v. N. Carolina Farm Bureau Fed'n, Inc.*, 60 F.4th 815, 833 (4th Cir. 2023); *Animal Legal Def. Fund v. Herbert*, 263 F. Supp. 3d 1193, 1209 (D. Utah 2017).

There is also no reasonable dispute that PETA has alleged its injury in sufficient detail. PETA has alleged that, but for Section 99, it would conduct an undercover, employment-based investigation in Hampden County and secretly record audio evidence of animal mistreatment and related conversations. *See* Compl. ¶¶ 6, 56, 59. Given the above precedent from the pre-enforcement context, these allegations, on their own, are sufficient to support a reasonable inference that PETA can satisfy the elements of standing. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). PETA has also alleged facts that further evince that its intent to engage in this conduct is neither abstract nor speculative, including

that it has repeatedly conducted materially similar undercover investigations across the country. Compl. ¶¶ 17-28*; see New Hampshire Right to Life,* 99 F.3d at 16 (crediting plaintiffs' prior conduct in that case); *Babbitt*, 442 U.S. at 2309-10 (same)*.*

But, even though Defendants do not dispute that PETA faces a credible threat of prosecution, they nevertheless argue that PETA must provide even more detail about its intended investigation. ECF No. 14 at 6. This is thoroughly unavailing. Courts have never required the level of specificity that Defendants demand. *See Martin*, 241 F. Supp. 3d at 282-83 (noting Supreme Court has not required strict "level of specificity from plaintiffs" in pre-enforcement cases). Instead, courts "will assume a credible threat of prosecution in the absence of compelling contrary evidence . . . even when those statutes have never been enforced." *Mangual*, 317 F.3d at 57 (adding that "[a] finding of no credible threat of prosecution under a criminal statute requires a long institutional history of disuse, bordering on desuetude." (internal citations omitted)). This threshold is easily met here, where Section 99 has been routinely prosecuted since its inception, including at least seven prosecutions in Hampden County in the last eight years, and Defendants make no effort to disavow the statute's applicability to PETA's intended conduct. Compl. ¶ 56; *see Project Veritas*, 982 F.3d at 829 (concluding Section 99 is not moribund). To otherwise require such a high level of detail would encourage exactly the type of self-censorship that First Amendment pre-enforcement review is supposed to avoid. Instead, an actual injury can exist simply from the chill of exercising one's constitutional right. *New Hampshire Right to Life*, 99 F.3d at 13; *Blum v. Holder*, 744 F.3d 790, 796 (1st Cir. 2014) (holding that a plaintiff may have standing in a First Amendment pre-enforcement challenge where they are "chilled from exercising [their] right to free expression or forgo[] expression in order to avoid enforcement consequences"). Indeed, PETA is entirely unable to capture audiovisual recordings that feature the sounds of

animals whenever humans are near, given Section 99's sweep—even though such recordings are essential to the efficacy of undercover investigations. Compl. ¶ 29. In this way, PETA is chilled in its investigative reporting due to the possibility of prosecution. *Mangual*, 317 F.3d at 58 (holding that a journalist had standing to challenge a criminal libel statute because "there [was] nothing Mangual [could] do to limit his exposure other than to curtail his investigative and journalistic activities.").

Further, as the First Circuit has recognized, there are limits to the details one can provide about an action that, by definition, has not yet occurred. *State of Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 692 (1st Cir. 1994). In *Martin v. Evans*, standing was not at issue even though the plaintiffs did not articulate specifically when they wished to engage in secret recording of police officers or which officers they wished to record. 241 F. Supp. 3d at 282-83. Likewise, *Alvarez* rejected as a "nonstarter" the argument that the plaintiffs' injury was conjectural or hypothetical because the planned secret recording of police officers will occur at some indefinite future time, at some unknown specific location, and involve unknown police officers. 679 F.3d at 593-54. Similarly, a union established pre-enforcement standing to challenge Arizona's prohibition of untruthful publicity in *Babbitt*, even though the plaintiffs neither identified a specific union campaign that was chilled by this statute and denied the intent to propagate untruths. 442 U.S. at 301-02. Here, the details of PETA's alleged plan exceed what was offered in those cases. PETA identifies the specific categories of speech (i.e., audio recordings of animal mistreatment and related conversations), in particular settings (i.e., nonpublic areas of animal-use facilities in Massachusetts), and in a specific county (Hampden County).

In sum, PETA has established both an intent to engage in a constitutionally protected, statutorily proscribed course of conduct and a credible threat of prosecution. "Nothing more is needed for pre-enforcement standing." *Alvarez*, 679 F.3d at 593.

> b. *Because Section 99 broadly chills First Amendment activity, PETA has standing to bring a facial overbreadth challenge.*

Defendants' standing argument rests entirely on their assertion that PETA has not described its intended investigative conduct with sufficient specificity. That argument is mistaken, but it also only pertains to PETA's as-applied challenge. Defendants do not separately dispute PETA's standing to bring its facial overbreadth challenge.

For First Amendment overbreadth challenges, one is entitled to challenge a statute not just because their own free speech rights may be affected, but because of the chilling effect that the statute may have on others. *Doe v. Hopkins Pub. Sch.*, 19 F.4th 493, 510 (1st Cir. 2010). As discussed, audio and audiovisual recordings are protected by the First Amendment. *See* § I(a) at p. 5, *supra*. Section 99's near unqualified reach chills more than just PETA's intended activity. It threatens any undercover investigation on issues of public concern that involves secret audio or audiovisual recordings. This is no less true if a participant wholly lacks any expectation of privacy. Otherwise, the law would encourage an undercover journalist to forego creating an unimpeachable audio recording of her investigation, or an employee to refrain from creating a secret workplace recording to preserve evidence for potential labor grievance—even though such secret recordings can be a protected labor activity. *See Starbucks Corp.*, 372 NLRB No. 50 (2023) (noting that 'workplace recordings, often covert, have been an essential element in vindicating employees' Section 7 rights"); *Whole Foods Market, Inc.*, 363 NLRB 800 (2015) (establishing that photography and recordings are protected if employees act in concert for mutual aid with no overriding employer interest). Similarly, such a doctrine would encourage a fair housing tester to

refrain from secretly recording evidence of housing discrimination. Fred Freiberg, *A Test of Our Fairness*, 41 Urb. Law. 239, 240, fn. 1 (2009) ("A strong cautionary note is in order…there are about a dozen states that require two-party consent to covertly record conversations. No fair housing enforcement program should begin equipping testers with concealed audio recorders unless legal research confirms that such recording is lawful under the applicable state law and that the recordings will be admissible in court."). Even a crime victim would likely be deterred from recording his own assault out of fear of Section 99's reach. *Johnson v. Frei*, 93 Mass. App. Ct. 1111, 2018 WL 2223654, at *1-*2 (May 16, 2018) (unpublished). It is because of Section 99's broad chilling effect that PETA has sufficient standing to raise a facial overbreadth challenge.

II.      **PETA's challenges are ripe.**

Ripeness and standing effectively "boil down to the same question." *Susan B. Anthony List*, 573 U.S. at 157, fn. 5 (quoting *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128, n.8 (2007)). "When free speech is at issue, concerns over chilling effect call for a relaxation of ripeness requirements." *Sullivan v. City of Augusta*, 511 F.3d 16, 31 (1st Cir. 2007). Nonetheless, "[t]o establish ripeness in a pre-enforcement context, a party must have concrete plans to engage immediately (or nearly so) in an arguably proscribed activity. This gives a precise shape to disobedience, posing a specific legal question fit for judicial review." *R.I. Ass'n of Realtors, Inc. v. Whitehouse*, 199 F.3d 26, 33 (1st Cir. 1999). In such an instance, a reasonable predictability of enforcement is largely regarded as sufficient for First Amendment claims to be deemed ripe. *See Sindicato Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 9 (1st Cir. 2012). PETA presently intends to create secret audio recordings during an undercover investigation at a facility in Hampden County. *See* Compl. ¶¶ 6, 56, 59. It has refrained from doing so out of a credible fear of prosecution under Section 99. *Id*. Until a Court can resolve the constitutional challenges PETA

raises, the First Amendment rights of PETA and others will continue to be chilled out of fear of Section 99's reach.

Defendants argue that PETA's claims are not ripe, alleging that the scope of relief requested is incongruent with PETA's planned conduct and that such conduct lacks sufficient details. ECF No. 14 at 8. These are solely quarrels with PETA's as-applied challenge.

In *Project Veritas*, the First Circuit did not hold that pre-enforcement challenges to Section 99 require exhaustive factual detail. Nor did it reject the plaintiffs' claims because their intended recordings were too speculative. Instead, the court concluded that certain as-applied claims were not ripe because the relief sought extended materially beyond the plaintiffs' described conduct. 982 F.3d at 841-44. The problem was one of mismatch or incongruence between the plaintiffs' actual plans and the scope of the requested injunction.[2]

That is not the case here. PETA's as-applied relief mirrors the very limited circumstances in which it wishes to engage in secret audio recordings "documenting animal mistreatment and conversations about the same in non-public portions of workplaces where animals are used for food production, clothing production, entertainment, experimentation, or bred or sold as companion animals." Compl. ¶¶ 3, 22, 71. In other words, PETA seeks pre-enforcement protection for the precise activity they would engage in but for Section 99. *See Project Veritas*, 982 F.3d at 842 (noting that *Alvarez* sought pre-enforcement protection for their specific planned conduct).

For example, Project Veritas alleged an intent to record "newsworthy" matters "in which the public has a legitimate concern," but sought relief invalidating Section 99 as applied to all

---

[2] *Project Veritas*'s "congruency" holding solely related to Project Veritas's two as-applied challenges, focusing on the connection between their explicit plans and relief. Notably, the First Circuit agreed with the District Court that Project Veritas's facial challenge was ripe. 982 F.3d at 840.

secret recordings of individuals lacking a reasonable expectation of privacy. *Id*. Likewise, although Project Veritas described plans involving particular governmental actors, it sought sweeping relief covering recordings of the broader category of all "government officials." *Id.* at 843-44. The First Circuit held that this incongruence doomed the Project Veritas' claims.

That defect is absent here. PETA's requested relief tracks its intended conduct with precision. PETA seeks protection only for the very investigative activity it alleges it intends to undertake: secret audio recordings "documenting animal mistreatment and conversations about the same in non-public portions of workplaces where animals are used for food production, clothing production, entertainment, experimentation, or bred or sold as companion animals." Compl. ¶ 71; *id*. at 22, ¶ 3. Unlike the plaintiffs in *Project Veritas*, PETA does not seek a broader ruling untethered from its planned conduct.

Finally, echoing its standing arguments, the Defendants argue PETA's planned conduct lacks detail, while at the same time acknowledging PETA's intended actions have "some discernable limited scope." ECF No. 14 at 10. As discussed above, PETA's planned conduct is no less detailed than in other cases where both standing and ripeness were found. *See* § I(a) at p. 7, *supra*. Moreover, the contours of PETA's planned activity are well defined. PETA is *only* interested in recording in a limited set of circumstances, that is, at commercial settings where animals are used for food production, displayed for entertainment, bred or offered for sale as companion animals, or used for experimentation. Compl. ¶¶ 1, 10, 60. PETA has no interest in recording at private abodes, portions of a workplace where PETA undercover investigators would not have lawful access, parts of a workplace where employees engage in intimate behavior (e.g., changing rooms or bathrooms), or where undercover investigators would encounter trade secrets or other commercially sensitive information. *Id*. at ¶¶ 19-27. In short, PETA is only interested in

documenting the unlawful handling and treatment of animals and conversations about the same in close proximity to locations where animals are handled and treated. PETA's proposed activity does not involve any broader categories, like the "inescapably public spaces" referenced in *Project Veritas*. Rather, PETA is interested in a discrete, enumerated list of places.

PETA's planned investigation is also no less defined than Project Veritas's planned investigations "to record government officials who are discharging their duties at or around the State House in Boston and other public spaces in hopes of learning those officials' unvarnished thoughts about immigration policy and deportation; to capture whether antifa public events and protests are peaceful, whether police or other public officials' interactions with antifa members are non-violent, and to otherwise report on those events." *Project Veritas*, 982 F.2d at 843. Indeed, the First Circuit explicitly remarked upon "the narrowness of Project Veritas's plans," strongly suggesting that the described activities were sufficiently well-defined for judicial review. *Id.* at 841; *see also id.* at 841 (noting that, notwithstanding its ultimate conclusion that Project Veritas's claim was not ripe due to the breadth of the relief Project Veritas sought, the court's decision did "not turn on any skepticism that, but for Section 99, Project Veritas would engage in the investigations it describes itself as intending to undertake").

PETA's claims hinge on a "purely legal assertion" that "a criminal statute [cannot] constitutionally bar their planned First Amendment activity" unless it is "supported by a legitimate interest." *Id.* at 828. Given the narrowness and definition of PETA's planned activity, there "is no need for additional factual development for [a court] to be able to assess the merits of the [PETA's] assertion that the categorical prohibition that Section 99 places on the recording for which they seek protection is . . . too uncalibrated to survive such First Amendment review." *Id.* at 829. And, just as in *Project Veritas*, a court can "tak[e] due account of both the fact that third parties may be

recorded and that secret recording can take many forms." *Id.* (noting that "those features bear on the merits of [a] challenge" but "do not render the contention that the ban at issue is overly broad unfit for resolution in federal court").

As such, PETA's imminent desire to create audio recordings of animal mistreatment, and the chill it faces as a result of Section 99, raises pure legal questions and is ripe for review. This Court should not defer this question and wait for PETA to be prosecuted. The creation of audio recordings, particularly on matters of public concern, is constitutionally protected. The impact of such recordings is profound, benefits the public writ large, and is critical to a healthy, well-informed democracy. Yet, Section 99's blunderbuss approach prohibits this important tool. This is demonstrated by the dilemma PETA faces: to invite and face prosecution under Section 99 or refrain from secret recordings of criminal animal mistreatment and related statements (and reporting on such mistreatment), core constitutionally protected activity. PETA is an appropriate plaintiff to address this acute harm, and the time to do so is now.

## Conclusion

For the foregoing reasons, PETA respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety.

## Request for Oral Argument

Plaintiffs request oral argument.

May 18, 2026

Respectfully submitted,

PEOPLE FOR THE ETHICAL TREATMENT
OF ANIMALS, INC.,

By its Attorneys,

Chris Carraway*
The Animal Activist Legal Defense Project at the
University of Denver Sturm College of Law
2255 E. Evans Ave., Denver, CO 80210
(423) 797-6084
Chris.Carraway@du.edu

Alexandra H. Deal
Paik Deal, LLP
6 Beacon Street, Suite 815
Boston, MA 02108
(617) 439-0150
adeal@paikdeal.com

Aaron Frazier*
Foundation to Support Animal Protection (PETA
Foundation)
501 Front Street
Norfolk, VA 23510
(757) 622-7382
AaronF@PetaF.org

*Counsel for Plaintiff*

*Pro Hac Vice Admission

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have today, May 18, 2026, served Plaintiff's Opposition to Defendants' Motion to Dismiss (ECF No. 19) via the CM/ECF system, and said Plaintiff's Opposition to Defendants' Motion to Dismiss was sent electronically to the registered participants as identified on the NEF.

May 18, 2026

Respectfully submitted,

Chris Carraway

- 15 -