FILED
IN CLERKS OFFICE
2026 SEP 10 A 11:57
U.S. DISTRICT COURT
DISTRICT OF MASS.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,**
Plaintiff,

v.

**ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; and ANTHONY D. GULLUNI, in his official capacity as Hampden County District Attorney,**

Defendants.

Civil Action No. **1:26-cv-10513-GAO**

---

**BRIEF OF AMICUS CURIAE BRANDON MICHAEL HAYES, PRO SE, PRESIDENT OF NATURAL LAW INSTITUTE, IN SUPPORT OF A NARROWLY TAILORED CONSTITUTIONAL REVIEW**

---

## INTEREST OF AMICUS CURIAE

Brandon Michael Hayes, appearing pro se, serves as President of Natural Law Institute ("NLI") and submits the accompanying amicus materials.

Natural Law Institute is a public-interest legal research organization dedicated to examining the relationship between lawful authority, institutional responsibility, individual rights, and the classification structures necessary for durable legal judgment.

Through this submission, Mr. Hayes presents NLI's institutional analysis concerning the legal architecture implicated by Plaintiff's requested relief.

This case presents an important constitutional question concerning the relationship between:

- the First Amendment interest in creating information;
- privacy protections governing covert interception of communications;

- workplace autonomy;
- governmental enforcement authority;
- and the regulation of human-animal relationships.

Plaintiff challenges Massachusetts General Laws c. 272, § 99, asserting that the statute restricts its ability to conduct undercover investigations involving animal-related facilities and create secret audio recordings concerning alleged animal mistreatment.

The significance of this dispute extends beyond the immediate question of recording methodology.

When evidence creation, public advocacy, enforcement consequences, and custodial outcomes intersect, courts require an analytical structure capable of distinguishing:

- legitimate accountability;
- evidentiary reliability;
- lawful privacy interests;
- proper stewardship standards;
- and conclusions that arise from advocacy positions rather than legal classifications.

This brief provides such a framework through classification of:

- the constitutional right asserted;
- the location and manner of evidence collection;
- the source of investigative access;
- the human-animal relationship involved;
- the applicable stewardship standard;
- the nature of the alleged violation;
- the evidentiary sufficiency of the recording;
- the necessity of covert collection;
- the consequences of intervention;
- the allocation of resulting obligations;
- and the appropriate scope of judicial remedy.

---

**INTRODUCTION**

This case is presented as a conflict between Massachusetts privacy protections and Plaintiff's asserted need to create evidence concerning alleged animal mistreatment.

The constitutional interests before the Court are:

1. Plaintiff's claimed First Amendment interest in gathering and creating information concerning matters of public concern; and
2. Massachusetts' authority to regulate secret interception of oral communications and protect individual privacy interests.

Plaintiff's public-interest justification carries significance. The exposure of unlawful conduct, including unlawful treatment of animals, represents a legitimate societal concern.

The existence of a public-interest objective, however, cannot independently resolve the constitutional boundary surrounding the method used to obtain information.

A complete analysis requires separate examination of several questions:

- What constitutional activity is asserted?
- Where does the information gathering occur?
- How is access obtained?
- What relationship exists between the human and animal involved?
- What standard governs that relationship?
- What conduct occurred?
- Who possesses the expertise required to classify that conduct?
- What context is necessary to interpret the evidence?
- Was the investigative method necessary?
- What consequences follow after intervention?

The legal system regularly encounters situations where the importance of discovering information and the legal limits surrounding the method of discovery require separate analysis.

Investigative journalism, whistleblower activity, government inspections, workplace investigations, and regulatory enforcement all demonstrate the same principle:

> **The value of information cannot independently determine the legal boundaries surrounding the means by which that information is obtained.**

This distinction is particularly important in animal-related disputes because "animal welfare" encompasses multiple human-animal relationships, each carrying different obligations, purposes, risks, and standards.

A companion animal integrated into a household, a detection animal performing a specialized function, a livestock animal maintained within an agricultural system, a research animal maintained within a regulated program, and an animal held by a rescue organization each exist within materially different relationships.

The legal question therefore cannot begin and end with the existence of an animal or the assertion that the animal requires protection.

The analysis begins with classification.

The central principle is:

> **No downstream public-benefit assertion substitutes for an unresolved upstream classification.**

The institutional component of that inquiry is developed in **Appendix A, Public Benefit Warrant**, which tests correspondence among represented purpose, investigative method, actual outcome, and externalized consequence.

A recording may provide evidence.

A recording does not itself supply:

- the governing standard;
- the applicable relationship;
- the required expertise;
- the legal significance of the conduct observed;
- or the proper remedy.

The Court's inquiry therefore involves more than a choice between privacy and animal protection.

It involves the structure by which law converts observations into judgments.

---

## I. THE CONSTITUTIONAL QUESTION CONCERNS THE RELATIONSHIP BETWEEN INFORMATION CREATION AND PRIVACY REGULATION

Plaintiff alleges that undercover recordings are necessary because they reveal conditions, conversations, and conduct that may otherwise remain hidden.

That proposition explains why Plaintiff seeks the recordings.

The constitutional analysis concerns what legal protection follows from that objective.

The relevant distinction is between:

**Information**

What was observed, recorded, or preserved?

**Classification**

What does the observed information demonstrate?

**Adjudication**

Does the conduct violate an applicable legal standard?

**Remedy**

What legal consequence follows?

Each stage performs a different function.

- Evidence gathering identifies facts.
- Classification assigns meaning.
- Adjudication applies governing law.
- Remedy determines consequence.

A private organization may identify evidence concerning matters of public concern. The legal significance of that evidence remains determined through applicable standards, procedures, and authorities.

This separation preserves both interests at stake:

- the ability to expose unlawful conduct;
- and the requirement that legal consequences arise from established standards rather than conclusory characterization.

---

## II. PUBLIC BENEFIT DOES NOT ITSELF DETERMINE THE CONSTITUTIONAL SCOPE OF THE INVESTIGATIVE METHOD

Plaintiff's asserted purpose places animal protection at the center of the factual narrative.

That purpose explains the motivation for investigation.

The constitutional inquiry remains focused on the relationship between:

- the information sought;

- the method used to obtain it;
- the privacy interests affected;
- and the governmental interests embodied in the challenged statute.

The existence of a valuable objective does not create an unlimited evidentiary authority.

The same principle applies throughout law.

- A government investigation may pursue a legitimate public purpose while remaining subject to constitutional restrictions.
- A journalist may seek information of public importance while remaining subject to generally applicable laws.
- A private organization may pursue accountability while operating within legal boundaries governing access, privacy, and evidence.

The proper inquiry therefore separates:

> the importance of discovering information

from

> the constitutional structure governing how information is obtained.

---

## III. THE PUBLIC-BENEFIT PREMISE REQUIRES CORRESPONDENCE BETWEEN REPRESENTED PURPOSE, INSTITUTIONAL METHOD, AND ACTUAL OUTCOME

Plaintiff's asserted public purpose performs more than a descriptive function in this litigation. Animal protection supplies substantial public-interest weight to the constitutional protection Plaintiff seeks for covert information creation.

That weight becomes measurable through correspondence.

A public-benefit claim can be evaluated through four connected inquiries:

> **REPRESENTED PURPOSE → INSTITUTIONAL METHOD → ACTUAL OUTCOME → EXTERNALIZED CONSEQUENCE**

The represented purpose identifies the benefit invoked.

The institutional method identifies the activity undertaken in pursuit of that benefit.

The actual outcome identifies what the intervention produces.

The externalized consequence identifies the obligations, costs, and custodial effects transferred to others.

**Appendix A, Public Benefit Warrant**, develops this inquiry as applied to Plaintiff and the particular animal-welfare justification advanced here. It distinguishes improvement of animal stewardship from the broader animal-rights proposition that categories of human-animal relationships themselves warrant elimination or displacement. It further separates Plaintiff's direct-care activity, advocacy, investigative work, enforcement referrals, anti-use campaigns, and animal-custody outcomes so that each can be evaluated according to the public benefit actually produced. See **Appendix A, Public Benefit Warrant.**

That distinction carries particular significance in this action. Plaintiff seeks constitutional protection for covert recording in nonpublic workplaces involving animals used for food production, clothing production, entertainment, experimentation, breeding, and sale as companion animals. Those categories substantially correspond to categories of human-animal relationships that Plaintiff's broader institutional program seeks to eliminate or fundamentally transform.

The correspondence supplies decisional relevance.

An investigation directed toward proving violation of an established animal-care standard presents one public-benefit claim. An investigation operating within a broader campaign against the lawful relationship itself presents another. A single investigation may contain elements of both.

The constitutional analysis gains precision by keeping the two functions distinct.

The same separation applies to the evidentiary sequence:

**RECORDING → CLASSIFICATION → INTERVENTION → OUTCOME**

A recording may accurately capture an event.

Classification determines whether that event represents legally cognizable mistreatment.

Intervention determines the legal or custodial response.

Outcome determines whether the asserted animal-welfare benefit was actually produced.

Appendix A supplies the institutional warrant through which those propositions remain independently measurable. Its function is to place the public-benefit premise into a form capable of legal comparison with the privacy, access, evidentiary, and remedial interests already before the Court, while preserving genuine animal-protection work as a distinct measurable benefit.

The resulting principle corresponds with the central rule of this brief:

> **No downstream public-benefit assertion substitutes for an unresolved upstream classification.**

---

## IV. UNDERCOVER INVESTIGATION CREATES A DISTINCT ACCESS AND AUTHORITY QUESTION

Plaintiff describes a method of investigation in which individuals obtain employment within facilities, observe operations from within those facilities, create recordings, and provide resulting information to government authorities and the public.

The legal significance of this method extends beyond the moment a recording device is activated.

Employment creates a distinct form of access.

A person entering a workplace as an employee receives:

- access to operational areas;
- exposure to internal procedures;
- relationships of trust;
- assigned duties;
- information unavailable to ordinary observers.

The resulting evidence arises through a relationship created for one purpose and used for another.

That circumstance does not determine the legal outcome by itself. It does, however, create a distinct analytical question:

> **Does a constitutional protection for information creation extend equally across every method by which an organization obtains access to information?**

The answer depends upon the surrounding structure.

The law recognizes meaningful distinctions among:

- an employee who encounters unlawful conduct during ordinary employment;
- a whistleblower who reports conduct discovered through employment;
- an investigative journalist gathering information through lawful means;
- an individual who obtains employment primarily for concealed evidence collection.

These categories involve different relationships between access, trust, privacy, and evidence creation.

A complete constitutional analysis therefore examines the full sequence:

> **TARGET SELECTION → ACCESS → EMPLOYMENT → PURPOSE → OBSERVATION → RECORDING → PUBLICATION → ENFORCEMENT REQUEST**

Each stage contributes to the legal character of the evidence.

The recording itself represents only one portion of the process.

---

## V. ACCESS, OBSERVATION, AND ADJUDICATION REMAIN DISTINCT FUNCTIONS

A central distinction in this matter is the difference between observing conduct and determining the legal meaning of conduct.

An investigator may accurately describe:

- what occurred;
- what was visible;
- what was audible;
- what was recorded.

The legal system then performs additional functions:

- identifying the governing standard;
- evaluating context;
- weighing competing explanations;
- determining whether the standard was violated.

This separation is fundamental because many regulated activities involve conduct that requires interpretation.

A physical action involving an animal may represent:

- lawful handling;
- necessary restraint;
- behavioral management;
- emergency intervention;
- improper treatment.

The observation exists before the classification.

The classification exists before adjudication.

The adjudication exists before remedy.

A reliable legal structure preserves those distinctions.

---

## VI. ANIMAL STEWARDSHIP REQUIRES CLASSIFICATION BEFORE CONDUCT CAN BE MEASURED

The term "animal welfare" encompasses multiple legal, economic, and social relationships.

The relationship between human and animal determines the nature of the obligations involved.

A companion animal, working animal, production animal, research animal, and rescue animal each exist within different systems of dependence and purpose.

The relevant inquiry begins:

> **What relationship exists between the human and animal, what purpose does that relationship serve, and what obligations arise from that relationship?**

A classification framework prevents unrelated standards from being applied interchangeably.

The same observed action may carry different meanings depending upon:

- species;
- temperament;
- purpose;
- environment;
- training;
- dependency;
- risk;
- professional standards.

---

### A. Companion Animals — Familial Integration and Compatibility Management

Companion animals exist within domestic relationships of dependency.

The defining characteristic is not unrestricted autonomy.

The defining characteristic is integration into a human environment where the custodian assumes responsibility for the animal's continued welfare and compatibility within that environment.

The governing standard is:

> **Whether the animal is successfully integrated into a stable human environment through responsible care and management proportionate to its behavioral capacity.**

This standard contains several measurable components.

**1. Dependency Fulfillment**

Domesticated companion animals depend upon human stewardship.

The custodian assumes responsibility for:

- nutrition;
- shelter;
- necessary veterinary care;
- protection from preventable harm;
- appropriate environmental conditions.

These obligations arise from domestication itself.

A domesticated animal exists within a relationship created and maintained through human responsibility.

**2. Compatibility Management**

A companion animal's quality of life exists within the reality of its temperament and environment.

Animals vary significantly.

Some animals are:

- stable;
- adaptable;
- socially appropriate;
- capable of broad household participation.

Others may demonstrate:

- aggression;
- fear responses;
- territorial behavior;
- prey drive;
- anxiety;
- inability to safely interact within certain environments.

The relevant question is not whether an animal experiences identical freedom in every household.

The relevant question is whether the custodian manages the animal according to its actual capabilities and limitations.

Management measures may include:

- structured confinement;
- separation from certain persons or animals;
- controlled interaction;
- behavioral modification;
- specialized handling.

A limitation placed upon an animal because of its behavioral reality may represent responsible stewardship.

An unmanaged behavioral problem may place:

- the animal;
- other animals;
- children;
- visitors;
- and the surrounding community

at risk.

**3. Behavioral Fitness**

Domestic animals exist within human communities.

The custodian's obligation includes recognizing and responding to demonstrated behavioral characteristics.

The relevant inquiry is:

> **Has the custodian responsibly managed the animal's known behavioral condition within the circumstances of its environment?**

An animal that cannot safely coexist without intervention requires management.

The alternative to management may create a greater threat to the animal's continued placement.

A responsible system recognizes that preserving an animal's life sometimes requires limits upon its immediate behavioral preferences.

**4. Training, Discipline, and Correction**

Training cannot be evaluated without considering:

- temperament;
- purpose;
- risk;
- behavioral history;
- intended outcome.

A method appropriate for one animal may be inappropriate for another.

A correction applied to a stable companion animal for minor conduct may carry a different meaning than a correction applied during intervention involving dangerous aggression or uncontrolled behavior.

The relevant inquiry concerns:

- proportionality;
- purpose;
- necessity;
- relationship to the behavioral objective.

The question is:

> Was the method reasonably directed toward safe and stable human-animal coexistence?

---

**B. Working Animals — Functional Partnership and Operational Fitness**

Working animals exist within purposeful relationships.

Examples include:

- service animals;
- detection animals;
- livestock guardians;
- hunting animals;
- law-enforcement animals;
- other trained operational animals.

The governing standard is:

> **Whether the animal is maintained and managed in a manner compatible with humane performance of its lawful function.**

A working animal's condition cannot be evaluated solely through the expectations governing an exclusively companion relationship.

The relevant measures include:

- physical condition;
- training;
- reliability;
- behavioral stability;
- operational environment;
- recovery and rest;
- appropriate maintenance.

The existence of purpose does not eliminate welfare obligations.

It defines them.

A detection dog, a livestock guardian, and a household pet may all be dogs, while existing within materially different human relationships.

---

**C. Production Animals — Species-Appropriate Husbandry and Lawful Use**

Production animals exist within agricultural systems.

The governing standard is:

> **Whether animals are maintained according to species-appropriate husbandry and applicable legal requirements governing lawful production.**

Relevant considerations include:

- nutrition;
- housing;
- sanitation;
- veterinary care;
- handling;
- environmental conditions;
- regulatory compliance.

Human use and animal welfare are not mutually exclusive categories.

The legal inquiry concerns the quality and legality of the stewardship relationship.

---

**D. Research Animals — Regulated Purpose and Controlled Welfare Obligations**

Research animals exist within regulated scientific systems.

The governing standard is:

> **Whether animal use occurs pursuant to lawful purpose and applicable controls governing treatment, necessity, and unnecessary suffering.**

The relevant inquiry includes:

- authorization;
- oversight;
- purpose;
- methodology;
- applicable welfare requirements.

---

**E. Rescue, Shelter, Sanctuary, and Protective Custody — Public Purpose Performance**

Organizations operating under rescue or protective missions occupy a distinct category.

Where an organization represents that its purpose is:

- rescue;
- rehabilitation;
- protection;
- placement;
- sanctuary,

its stewardship obligations include the conditions created after intervention.

Relevant measures include:

- intake decisions;
- available resources;
- treatment capacity;
- housing;
- rehabilitation;
- placement;
- custody duration;
- animal outcomes.

An institution claiming a protective purpose can be evaluated according to whether the institution performs the custodial function represented to the public.

The classification matters because the legal system evaluates different relationships through different standards.

---

## VII. THE OBSERVED EVENT REQUIRES CONTEXT BEFORE LEGAL CLASSIFICATION

A recording establishes an occurrence.

It does not automatically establish the legal meaning of that occurrence.

A recording may show:

- a physical interaction;
- a vocalization;
- a restraint;
- a correction;
- a handling method;
- a condition.

The interpretation requires additional information.

Relevant context may include:

- prior behavior;
- training history;
- medical condition;
- operational purpose;
- immediate risk;
- surrounding circumstances.

The proper sequence is:

**EVENT → CONTEXT → PATTERN → CLASSIFICATION**

The shorter the observation window, the greater the importance of contextual interpretation.

A single event may establish a violation in some circumstances.

Other circumstances require evaluation of pattern, purpose, and surrounding facts.

The evidentiary sufficiency depends upon the nature of the allegation.

---

## VIII. THE NATURE OF THE ALLEGED WRONG REQUIRES CLASSIFICATION BEFORE LEGAL CONSEQUENCE

Animal-related disputes contain materially different categories of disagreement.

A complete legal analysis distinguishes among:

1. clearly unlawful conduct;
2. objectively measurable neglect;
3. professional or technical disputes;
4. stewardship disagreements.

These categories carry different evidentiary requirements and different legal consequences.

### A. Clearly Unlawful Conduct

Some conduct may be evaluated through direct application of governing law.

Examples include conduct involving:

- intentional injury;
- prohibited acts of cruelty;
- legally defined deprivation;
- violations of established regulatory requirements.

In such circumstances, evidence collection serves a straightforward function:

establishing whether prohibited conduct occurred.

**B. Objectively Measurable Neglect**

Certain failures of care can be evaluated through measurable standards.

Examples include:

- absence of required nutrition;
- untreated injury;
- inadequate shelter;
- failure to provide legally required care;
- conditions inconsistent with established regulatory requirements.

These categories involve identifiable benchmarks.

The inquiry concerns whether the applicable standard was satisfied.

**C. Professional or Technical Disputes**

Many animal-related decisions involve specialized judgment.

Examples include:

- veterinary decisions;
- behavioral management;
- training methodology;
- husbandry practices;
- handling techniques;
- operational protocols.

These matters require evaluation through the knowledge applicable to the animal, environment, and purpose involved.

An observer may identify a physical event.

The classification of that event may require expertise.

**D. Stewardship Disagreement**

Some disputes arise from differing views concerning:

- animal ownership;
- animal use;
- breeding;
- training philosophy;
- management practices;
- human-animal relationships.

These disputes involve broader policy and philosophical questions.

A disagreement over the preferred relationship between humans and animals cannot by itself establish that a lawful practice constitutes abuse.

A legal standard requires a defined obligation and a measurable departure from that obligation.

---

## IX. EXPERTISE MUST CORRESPOND TO THE CLASSIFICATION BEING MADE

Animal-related expertise is specialized.

The ability to observe an event does not automatically provide the ability to classify its legal significance.

An investigator may accurately state:

> I observed this event.

The additional conclusion:

> This event constituted unlawful mistreatment.

requires a separate analytical step.

Relevant expertise may include:

- veterinary medicine;
- animal behavior;
- species-specific care;

- working-animal training;
- agricultural husbandry;
- livestock management;
- regulated animal-use practices.

Different species, purposes, and environments generate different standards.

A person experienced with one category of animal care may possess limited expertise concerning another.

A companion-animal trainer, agricultural operator, veterinarian, working-dog handler, and laboratory-animal specialist may each possess valuable knowledge within distinct domains.

The legal system benefits from matching classification authority to the subject matter being classified.

Observation and classification remain separate functions.

---

## X. GREATER SECRECY IN EVIDENCE CREATION WARRANTS GREATER TRANSPARENCY IN EVIDENCE PRESERVATION

Covert evidence creates a structural asymmetry.

The person being recorded may lack knowledge of:

- when recording began;
- what portions were captured;
- what portions were omitted;
- what occurred immediately before;
- what occurred immediately after;
- what contextual information exists.

The evidentiary value of a recording depends upon more than the existence of the recording itself.

It depends upon integrity.

Where evidence is created through a process unavailable to the subject at the time of creation, preservation practices become increasingly important.

Relevant safeguards include:

- preservation of complete original recordings;
- retention of metadata;
- timestamps;
- chain-of-custody documentation;
- preservation of surrounding footage or audio;
- disclosure of material edits;
- preservation of relevant contextual observations.

Greater secrecy in evidence creation increases the importance of transparency in evidence preservation.

A right to create evidence does not transform selective presentation into complete evidence.

---

## XI. NECESSITY OF COVERT RECORDING IS A FACT-SPECIFIC INQUIRY

Plaintiff alleges that covert recording is necessary because certain information cannot otherwise be obtained.

That proposition may apply differently depending upon the information sought.

Potential evidence sources include:

- visible physical conditions;
- regulatory records;
- veterinary documentation;
- witness testimony;
- inspection records;
- photographs;
- openly collected observations;
- recorded communications.

The relevant inquiry concerns:

> **What information is sought, why the information is necessary, why covert collection is required to obtain that information, and what privacy interests are affected?**

Different evidence types present different balances.

A physical condition visible to ordinary observation presents a different question from a private conversation occurring within a restricted workplace.

An alleged violation documented through ordinary observation presents a different question from an alleged violation dependent upon a private communication.

Necessity therefore requires connection between:

- the information sought;
- the method used;
- and the privacy burden created.

---

**XII. INTERVENTION REQUIRES ANALYSIS OF CUSTODIAL CONSEQUENCES**

Animal protection does not end at the moment alleged mistreatment is identified.

A complete stewardship analysis evaluates the condition before intervention and the condition created afterward.

The relevant question becomes:

> **Did intervention improve the animal's circumstances?**

Removal from one environment creates a corresponding custodial obligation.

Relevant outcomes include:

- transfer;
- shelter placement;
- rehabilitation;
- adoption;
- sanctuary placement;
- return;
- continued custody;
- euthanasia.

The full sequence is:

> **ORIGINAL CUSTODY → IDENTIFICATION → INTERVENTION → REPLACEMENT CUSTODY → OUTCOME**

Each stage affects the welfare analysis.

An enforcement system evaluates more than the discovery of a problem.

It evaluates the resulting condition.

A durable stewardship structure accounts for:

- who assumes responsibility;
- what resources exist;
- what care is provided;
- what final outcome occurs.

---

## XIII. PUBLIC BENEFIT ANALYSIS INCLUDES RESULTING OBLIGATIONS

Public-interest activity produces both benefits and responsibilities.

An investigation may:

- expose unlawful conduct;
- improve enforcement;
- inform public debate;
- generate institutional change.

Intervention may also create obligations involving:

- transportation;
- veterinary treatment;
- housing;
- rehabilitation;
- placement;
- long-term care.

Those obligations may fall upon:

- governmental entities;
- nonprofit organizations;
- shelters;
- private custodians;
- taxpayers.

A complete public-benefit analysis includes both:

- the benefit generated by discovery;
- the obligations generated by the resulting action.

**Appendix A applies this principle institutionally to Plaintiff.** The Public Benefit Warrant measures the asserted protective benefit across the full sequence of representation, investigation, classification, intervention, custody, and outcome. That correspondence prevents the success of an enforcement action, the exposure of an event, and improvement in the condition of an animal from being treated as interchangeable propositions.

This principle applies broadly across legal systems.

The creation of authority, information, or intervention capacity carries corresponding questions concerning responsibility.

---

## XIV. FIXED DECISIONAL SEQUENCE

The constitutional analysis benefits from a structured sequence.

Each step answers a different question.

### 1. RIGHT

What constitutional activity is asserted?

### 2. PLACE

Where does the recording occur?

Consider:

- public space;
- publicly accessible space;
- workplace;
- restricted workplace area;
- private location.

### 3. ACCESS

How was access obtained?

Consider:

- ordinary presence;
- employment;

- invitation;
- whistleblower status;
- investigative placement.

**4. RELATIONSHIP**

What human-animal relationship exists?

Consider:

- companion;
- working;
- production;
- research;
- rescue/protective custody.

**5. STANDARD**

What measurable stewardship standard applies?

**6. CONDUCT**

What occurred?

**7. EXPERTISE**

Who possesses the knowledge required to classify the conduct?

**8. CONTEXT**

Does the evidence establish:

- an event;
- a condition;
- a pattern;
- a violation?

**9. EVIDENCE**

Is the record complete, reliable, and preserved?

**10. NECESSITY**

Was the method required to obtain the relevant information?

**11. CUSTODY**

What happens after intervention?

---

**12. EXTERNALITY**

Who bears the resulting obligations?

**13. REMEDY**

What legal consequence corresponds to the established violation?

Compressed:

> **RIGHT → PLACE → ACCESS → RELATIONSHIP → STANDARD → CONDUCT → EXPERTISE → CONTEXT → EVIDENCE → NECESSITY → CUSTODY → EXTERNALITY → REMEDY**

This sequence preserves the distinction between:

- discovering information;
- interpreting information;
- applying law;
- imposing consequence.

---

## XV. THE CONSTITUTIONAL QUESTION PRESERVES LEGISLATIVE AUTHORITY

The dispute before the Court concerns constitutional boundaries surrounding investigative recording.

The broader policy landscape includes:

- whistleblower protections;
- workplace privacy;
- evidence preservation;
- investigative standards;

- animal custody;
- cost allocation;
- enforcement procedures.

Those subjects involve institutional choices concerning competing interests.

A constitutional ruling operates within that framework by defining protected boundaries while preserving the ability of legislative institutions to address detailed policy questions.

The result preserves multiple interests:

- accountability for unlawful conduct;
- privacy protection;
- evidentiary reliability;
- lawful animal stewardship;
- institutional responsibility.

---

## XVI. AVAILABLE CONSTITUTIONAL RESOLUTIONS

The legal framework allows multiple forms of resolution.

A broad facial determination affects all applications of a statute.

A narrower determination examines particular applications and circumstances.

A tailored ruling may account for:

- the location of recording;
- the method of access;
- the nature of the communication;
- the public interest asserted;
- the privacy interest affected;
- the necessity of the recording method.

The distinction matters because different factual circumstances produce different constitutional questions.

The Court's role remains determining the constitutional boundary presented by the dispute.

The broader design of investigative systems, evidentiary safeguards, and stewardship obligations remains available through legislative processes.

---

**CONCLUSION**

Animal protection and privacy protection exist within the same legal landscape.

A durable framework recognizes both.

The exposure of unlawful conduct serves an important public purpose.

The protection of privacy, workplace integrity, evidentiary reliability, and lawful stewardship also serves important public purposes.

The constitutional question therefore extends beyond whether alleged cruelty may be exposed.

It concerns the legal structure governing:

- how evidence is created;
- how evidence is interpreted;
- how conduct is classified;
- how intervention is carried out;
- and how consequences are allocated.

Animal stewardship varies according to relationship, purpose, species, dependency, and lawful function.

Evidence varies according to provenance, context, completeness, expertise, and necessity.

Remedies vary according to responsibility, custody, and outcome.

A complete constitutional analysis recognizes these distinctions.

The governing principle is:

> **Evidence requires classification. Classification requires standards. Standards require lawful authority. Public benefit requires responsible structure.**

The dispute therefore presents more than a conflict between privacy and animal protection.

It presents a classification problem.

---

Respectfully submitted,

**Brandon Michael Hayes**
Pro Se
President, Natural Law Institute
159 Indian Hill Street
West Newbury, Massachusetts 01985
brandon@hayeshaus.com
(617) 438-2049

Dated: __________