FILED
IN CLERKS OFFICE
2026 SEP 10 A 11:58
U.S. DISTRICT COURT
DISTRICT OF MASS.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,**
Plaintiff,

v.

**ANDREA JOY CAMPBELL, in her official capacity as Attorney General of the Commonwealth of Massachusetts; and ANTHONY D. GULLUNI, in his official capacity as Hampden County District Attorney,**

Defendants.

Civil Action No. **1:26-cv-10513-GAO**

---

**APPENDIX A TO THE BRIEF OF AMICUS CURIAE BRANDON MICHAEL HAYES, PRO SE, PRESIDENT OF NATURAL LAW INSTITUTE**

**PUBLIC BENEFIT WARRANT**

**PETA, ANIMAL WELFARE, ANIMAL RIGHTS, AND THE CORRESPONDENCE BETWEEN REPRESENTED PURPOSE, INSTITUTIONAL METHOD, AND ACTUAL OUTCOME**

---

**PURPOSE AND FRAMEWORK**

This Appendix supplements the accompanying Amicus Curiae Brief by providing the institutional classification necessary to evaluate the public-benefit premise embedded in Plaintiff's constitutional claim.

Plaintiff presents covert evidence creation as instrumental to exposing animal mistreatment, protecting animals, prompting governmental enforcement, and advancing the public interest. Those propositions give the asserted recording activity much of its claimed public significance.

The resulting analysis requires correspondence among four separate matters:

**REPRESENTED PURPOSE → INSTITUTIONAL METHOD → ACTUAL OUTCOME → EXTERNALIZED CONSEQUENCE**

People for the Ethical Treatment of Animals occupies several institutional roles simultaneously. It provides direct animal services; advocates for animal protection; conducts investigations; seeks enforcement action; campaigns against major categories of human animal use; and advances an animal-rights philosophy extending beyond improvement of existing stewardship relationships.

Those functions produce materially different forms of public benefit and materially different legal consequences.

PETA's institutional name communicates a familiar and broadly supported proposition: animals entrusted to human beings deserve ethical treatment. Its stated philosophy reaches considerably further. PETA identifies itself as an animal-rights organization and opposes major categories of human animal use, including use for food, experimentation, clothing, entertainment, and breeding.

Those propositions describe an institutional philosophy materially different from the ordinary animal-welfare model of **human stewardship over domesticated, working, agricultural, research, and companion animals.**

That distinction carries direct relevance in *PETA v. Campbell* because Plaintiff presents covert evidence collection as instrumental to protecting animals from mistreatment, while the categories of facilities targeted for covert investigation substantially correspond to categories of human-animal relationships PETA institutionally seeks to eliminate or fundamentally transform: **food production, clothing production, entertainment, experimentation, breeding, and sale of companion animals.**

The constitutional significance therefore extends beyond whether covert recording can expose genuine cruelty.

The foundational question is whether an organization's asserted public benefit can provide weight for expanded investigative authority when the organization's definition of the public benefit extends beyond correcting unlawful treatment and into displacement of the lawful relationships being investigated.

This Appendix places that question into a measurable institutional framework.

Its central inquiry is:

> **When an institution invokes animal protection as the public warrant for expanded investigative authority, does the claimed benefit correspond to the**

> **standards it applies, the methods it employs, and the outcomes its intervention actually produces?**

That inquiry permits the Court to distinguish animal welfare from animal-rights advocacy, evidence collection from legal classification, and public benefit from institutional preference without resolving the broader philosophical debate surrounding animal use.

---

## I. "ETHICAL TREATMENT" AND "ANIMAL RIGHTS" DESCRIBE DIFFERENT PROJECTS

Animal welfare begins from an existing human-animal relationship.

The animal may be:

a companion, a working partner, livestock, a research animal, an animal in rehabilitation, or another domesticated creature under human custody.

The welfare inquiry asks:

> **What obligations arise from this relationship, and are those obligations being fulfilled?**

That inquiry accepts stewardship as the operative relationship and evaluates its quality.

Animal-rights ideology begins from a different premise.

PETA states that animals possess intrinsic worth apart from their utility to humans and declares that animals are not ours to experiment on, eat, wear, use for entertainment, or abuse. Its companion-animal materials go farther: PETA says that in an ideal world animals would be free from human interference, opposes all breeding, and states that it would be in animals' interests eventually to cease breeding dogs and cats into dependency upon humans.

PETA also describes dogs, cats, and other sentient animals as "individuals, not property," and identifies "speciesism"—human preference for different treatment based upon species—as a central wrong its work seeks to overcome.

The distinction can therefore be stated precisely:

> **Animal welfare regulates stewardship. Animal-rights ideology places the legitimacy of stewardship itself in question.**

Both may oppose cruelty.

They diverge dramatically once humane human use remains possible.

A welfare framework can conclude that a farm, breeder, trainer, laboratory, working-dog operation, or animal exhibitor complies with stringent stewardship duties.

PETA's philosophy can continue opposing the activity after every welfare defect has been cured because its institutional objection extends to the underlying human use.

That is the classificatory distinction obscured by the phrase "ethical treatment of animals."

---

## II. PETA'S NAME DESCRIBES A METHOD OF MORAL EVALUATION; ITS STATED END STATE IS MUCH BROADER

A member of the public encountering the name **People for the Ethical Treatment of Animals** can reasonably understand the institutional purpose as:

> improving how people treat animals.

PETA's official materials establish a broader objective.

Its campaigns seek an end to animal experimentation, animal consumption, animal-derived clothing, animal entertainment, and animal breeding. Its 2025 Annual Review organizes its principal work around those exact categories and celebrates closures, funding withdrawals, commercial abandonment of animal products, sterilization, and other reductions in human animal use.

The operative distinction is therefore between:

> **better stewardship of animals within human society**

and

> **progressive removal of categories of human use of animals.**

The second position may be advocated through democratic processes. It carries different implications from the first.

The public-benefit warrant requires the distinction to remain visible because an institution cannot use the broad social consensus surrounding prevention of cruelty as an interchangeable warrant for every component of a much broader animal-rights program.

---

## III. PETA DOES PERFORM DIRECT ANIMAL-CARE FUNCTIONS

Correspondence requires the entire record.

PETA is more than an enforcement and advocacy organization.

Its own 2025 reporting identifies substantial direct services, including mobile sterilization clinics, veterinary assistance, doghouses and bedding, emergency response, transports, cruelty casework, and assistance allowing families to retain animals. PETA reports sterilizing more than 11,200 cats and dogs through its Mobile Clinics Division during its fiscal year and more than 249,000 cumulatively.

Virginia's 2025 animal-custody report contains further detail. PETA reported spending more than $3.24 million on local companion-animal services, operating around-the-clock intake, assisting more than 3,000 families with medical and behavioral needs, distributing doghouses and bedding, and providing free or low-cost sterilization.

Its 2025 Annual Review also provides examples in which animals removed following intervention were transported to sanctuaries or adopted into homes.

Those activities constitute actual stewardship outputs.

They matter because the appropriate critique is therefore more precise than saying PETA provides no animal care.

The institutional question is:

> **What portion of PETA's public-benefit claim derives from improving stewardship, and what portion derives from terminating relationships with animals that PETA institutionally opposes even where improved stewardship remains possible?**

That is the correspondence problem.

---

## IV. PETA'S OWN CUSTODY RECORD REVEALS WHY "RESCUE" AND "CARE" REQUIRE OUTCOME MEASUREMENT

Virginia classifies PETA as a private animal shelter.

For reporting year 2025, its official filing records 2,854 animals handled. The disposition table reports 746 reclaimed by owners, 45 adopted, 375 transferred to Virginia releasing agencies, two transferred out of state, and 1,684 euthanized.

Those numbers require context.

PETA states in the same public report that more than 615 euthanasia cases represented free end-of-life services requested by guardians seeking relief for suffering animals, and that the vast majority of euthanized cats were feral animals received from jurisdictions lacking services. PETA also reports an unrestricted intake model that accepts animals regardless of adoptability.

That explanation deserves inclusion beside the raw figures.

The combination establishes the deeper institutional point:

> **"Saving an animal" cannot be measured at the moment custody changes.**

The proper measure extends through:

**INITIAL CONDITION → INTERVENTION → CUSTODY → TREATMENT → PLACEMENT OR DISPOSITION → FINAL CONDITION**

- An organization can perform a socially valuable act by ending severe suffering through humane euthanasia.
- An organization can perform a socially valuable act by transferring an animal from destructive custody into a stable home.
- An organization can also initiate intervention whose downstream costs and custodial burdens are carried by municipalities, shelters, taxpayers, or unrelated rescuers.

Those are materially different outcomes.

A public-benefit warrant measures them separately.

---

## V. PETA FUNCTIONS SIMULTANEOUSLY AS CARE PROVIDER, ADVOCATE, INVESTIGATOR, CAMPAIGNER, AND ENFORCEMENT CATALYST

PETA's institutional structure spans several functions.

Its audited financial statement describes a Cruelty Investigations Department that receives reports, gathers evidence of legal violations, testifies in court, connects guardians with services, directly rescues animals, and operates emergency response.

Its annual reporting describes undercover investigations leading to criminal investigations, government enforcement, closure of facilities, withdrawal of corporate business, termination of research, and policy changes.

Its advocacy simultaneously seeks broader elimination of animal use.

This creates an important institutional sequence:

> **IDEOLOGICAL STANDARD → TARGET SELECTION → INVESTIGATION → EVIDENCE CREATION → PUBLIC NARRATIVE → ENFORCEMENT REFERRAL → CUSTODY OR INDUSTRY CONSEQUENCE**

Each individual step can serve a lawful purpose.

The combined structure creates a need for decisional separation.

The organization identifying an event cannot receive automatic deference concerning:

- the legal standard;
- the meaning of the event;
- the adequacy of context;
- the expertise required;
- the proportional remedy;
- or the quality of the replacement outcome.

That is precisely why classification belongs between observation and consequence.

---

## VI. THE PRESENT LAWSUIT TRACKS PETA'S IDEOLOGICAL PROGRAM WITH UNUSUAL PRECISION

The complaint seeks protection for secret recordings made in nonpublic portions of workplaces where animals are:

- used for food production;
- used for clothing production;
- used for entertainment;
- used for experimentation;
- bred or sold as companion animals.

That list is significant.

PETA's own stated mission is organized around essentially the same categories:

- animals are not ours to eat;
- animals are not ours to wear;
- animals are not ours to use for entertainment;
- animals are not ours to experiment on;
- PETA opposes breeding and the commercial pet trade.

The complaint therefore seeks constitutional protection for covert investigative activity across the principal categories of lawful human-animal relations that PETA's institutional program seeks to terminate or substantially displace.

That correspondence does not establish improper motive.

It does establish **institutional relevance**.

The Court is evaluating a recording right claimed by an investigator whose scope of proposed investigation maps directly onto its broader policy program.

The public-benefit premise therefore requires disaggregation:

> **Is a particular investigation aimed at proving violation of an established animal-care standard?**

or:

> **Is the investigation operating within a broader institutional campaign against the lawful activity itself?**

The same recording can serve both functions.

Law has to classify which function supplies the constitutional warrant.

---

## VII. THE COMPLAINT COMPRESSES THREE DIFFERENT PROPOSITIONS INTO ONE

The complaint repeatedly links:

**secret recording → exposure of mistreatment → protection of animals.**

Those are three independent propositions.

**Proposition One: The recording accurately captures an event.**

This is an evidentiary question.

**Proposition Two: The event constitutes legally cognizable mistreatment.**

This is a classification question requiring a governing standard, context, and sometimes expertise.

**Proposition Three: Intervention based upon that classification improves animal welfare.**

This is an outcome question requiring custody and disposition analysis.

None is supplied automatically by the preceding proposition.

- A recording can accurately document conduct that is lawful.
- A genuine violation can produce a disproportionate intervention.
- An enforcement victory can leave an animal in an equal or worse custodial condition.

A lawful and durable public-benefit claim therefore requires all three propositions to hold.

---

## VIII. PETA'S ANIMAL-RIGHTS END STATE OPERATES IN THE OPPOSITE DIRECTION FROM ANIMAL-WELFARE STEWARDSHIP

PETA openly describes itself as dedicated to establishing and defending animal rights.

In this case, the constitutional right asserted belongs to PETA under the First Amendment. The animal-treatment allegations supply the factual and public-interest justification for the investigative authority Plaintiff seeks.

The distinction between **animal welfare** and PETA's conception of **animal rights** therefore carries more than semantic importance.

They operate from different premises and toward different endpoints.

Animal welfare begins with an existing relationship between human beings and animals.

The relationship may involve:

- companionship;
- work;
- agriculture;

- research;
- breeding;
- rescue;
- rehabilitation;
- shelter;
- other forms of lawful custody or use.

The welfare inquiry asks:

> **What obligations arise from this relationship, and is the human custodian fulfilling them?**

Its operative objective is improvement of the relationship.

- Deficient stewardship can be corrected.
- Poor husbandry can be improved.
- Improper training can be replaced with competent training.
- Neglect can be remedied.
- Necessary veterinary care can be provided.

The relationship remains capable of lawful continuation once the governing obligation is satisfied.

PETA's stated animal-rights philosophy moves in a materially different direction.

Its institutional objection extends beyond the quality of many human-animal relationships and reaches the continued existence of the relationships themselves.

PETA opposes animal use for food, clothing, experimentation, and entertainment; opposes breeding; rejects treatment of animals as property; and describes an ideal condition in which animals eventually exist free from the forms of human interference and dependency it opposes.

Under that framework, improvement of stewardship does not necessarily resolve the objection.

- A farm can improve husbandry and remain objectionable because animals are still being used for food.
- A laboratory can improve treatment and remain objectionable because animals are still being used in research.
- A breeder can provide exemplary care and remain objectionable because breeding itself remains opposed.
- A working-animal program can satisfy demanding welfare standards and remain inconsistent with a philosophy rejecting the underlying human use.

The difference is structural:

> **Animal welfare asks how a human-animal relationship is being performed.**
>
> **PETA's animal-rights framework asks whether broad categories of that relationship are permitted to continue at all.**

The two approaches therefore diverge at the point where adequate stewardship has been achieved.

Under a welfare model:

> **DEFICIENCY → CORRECTION → ADEQUATE STEWARDSHIP → CONTINUED RELATIONSHIP**

Under PETA's broader rights model, across the categories it institutionally opposes:

> **HUMAN-ANIMAL RELATIONSHIP → EXPLOITATIVE CLASSIFICATION → REDUCTION OR TERMINATION OF THE RELATIONSHIP**

That difference makes the two frameworks functionally opposed across substantial portions of Plaintiff's institutional program.

One framework measures the quality of stewardship.

The other seeks removal of categories of stewardship it regards as impermissible.

That distinction bears directly upon the public-benefit premise of this litigation.

Plaintiff characterizes covert recording as a mechanism for exposing animal mistreatment and protecting animals. Yet the facilities selected for the requested investigative activity substantially correspond to categories of human-animal relationships that Plaintiff opposes at the level of principle.

The resulting public-benefit claim therefore contains two potentially different objectives:

> **improving the treatment of animals within an existing lawful relationship**

and

> **advancing the displacement of a relationship Plaintiff regards as inherently objectionable.**

Those objectives require separate treatment.

The first corresponds directly with animal-welfare law.

The second corresponds with Plaintiff's broader animal-rights program.

Conflating them allows opposition to the underlying relationship to acquire the legal appearance of opposition to unlawful treatment within the relationship.

That produces the circular sequence:

> **PETA regards the relationship as exploitation → the relationship becomes an investigative target → selected conduct within that relationship is documented → the documentation is characterized through the preexisting ideological standard → the resulting characterization supplies public-interest weight for expanded investigative authority.**

Classification interrupts that sequence.

- The governing law supplies the standard.
- Evidence establishes the facts.
- Qualified interpretation supplies context where necessary.
- Adjudication determines whether the legal standard was violated.
- The existence of the underlying human-animal relationship remains analytically separate from the quality with which that relationship is performed.

This distinction produces a clean institutional boundary:

> **Cruelty law regulates deficient stewardship.**
>
> **Animal-welfare law regulates the quality of stewardship.**
>
> **PETA's broader animal-rights program seeks, across major categories, the disappearance of the stewardship relationship itself.**

The constitutional analysis gains accuracy by keeping those propositions separate.

PETA remains free to advocate for its preferred animal-rights end state through public persuasion, legislation, litigation, and political processes. The public-benefit warrant at issue here, however, turns upon the benefit claimed for the investigative activity actually presented to the Court.

Where that claimed benefit is **protection from mistreatment**, the relevant measure is whether established animal-welfare obligations were violated.

Where the institutional objective is **elimination of the lawful relationship itself**, that objective presents a different proposition carrying its own legal and democratic path.

The distinction is decisive because successful animal welfare and successful animal rights, as PETA defines the latter across these categories, can produce opposite outcomes:

> **Successful welfare preserves a lawful human-animal relationship by making the stewardship adequate.**
>
> **Successful implementation of PETA's broader animal-rights objective terminates categories of that relationship despite adequate stewardship.**

That is why the two concepts cannot function as interchangeable public-interest warrants.

---

## IX. STEWARDSHIP PROVIDES THE CORRESPONDENT ALTERNATIVE

American animal governance has historically operated primarily through stewardship.

Under stewardship, human custody generates duties.

Those duties vary according to relationship.

- A companion dog requires familial integration and compatibility management.
- A detection dog requires operational fitness.
- Livestock require species-appropriate husbandry.
- Research animals exist within regulated use.
- Shelter and rescue animals require custodial continuity and disposition accountability.

The governing proposition is:

> **Human use creates responsibility proportional to dependency, purpose, capacity, and foreseeable externality.**

This differs from a rights model in which lawful human use itself becomes suspect.

The distinction produces a clean decisional boundary:

**Stewardship question**

> Is this human-animal relationship being performed lawfully and competently?

**Animal-rights question**

Is this human-animal relationship morally permissible to exist?

The first is routinely justiciable through existing law.

The second belongs predominantly to public policy, legislation, political advocacy, and moral debate.

PETA's present lawsuit gains apparent simplicity by allowing the two to overlap.

The explainer separates them.

---

## X. PUBLIC BENEFIT REQUIRES CORRESPONDENCE BETWEEN REPRESENTATION, METHOD, AND OUTCOME

A public-benefit organization gains legitimacy from correspondence.

Its represented purpose, actual operations, institutional incentives, and measurable outcomes must point in the same direction.

For PETA, the public-benefit warrant can be stated through four questions:

**Representation:** What benefit is represented to the public?

**Method:** What institutional activity produces that benefit?

**Outcome:** What measurable result follows?

**Externality:** Who bears the downstream costs and obligations?

Applied here:

PETA represents animal protection.

Its methods include direct care, sterilization, advocacy, covert investigation, publicity, litigation, enforcement referral, and campaigns to terminate numerous forms of animal use.

Its outcomes include rescued and rehomed animals, medical care, sterilization, prosecution, institutional closure, commercial change, transfer of custody, and substantial euthanasia within its own shelter operation.

Those outcomes are heterogeneous. They cannot accurately be compressed into a single term such as **"saving animals,"** or into a neatly packaged institutional motto such as **"People for the**

**Ethical Treatment of Animals,"** where the organization's demonstrated program reaches beyond the quality of human-animal relationships and toward the reduction or elimination of those relationships across entire categories of lawful animal use.

---

## XI. THE PUBLIC-BENEFIT WARRANT

The relevant test is therefore:

> **Does the asserted public benefit correspond to the activity protected, the standard applied, and the result produced?**

Applied to an undercover investigation:

**Predicate**
Is there an articulable basis for suspecting violation of an established animal-care standard?

**Access**
How was access obtained?

**Evidence**
What was recorded and preserved?

**Classification**
Which governing stewardship standard applies?

**Expertise**
Who is competent to interpret the conduct?

**Violation**
What law or measurable obligation was breached?

**Remedy**
What intervention corresponds to the violation?

**Custody**
What condition follows removal or enforcement?

**Cost**
Who assumes the resulting burden?

**Outcome**
Did the animal's actual condition improve?

This converts moral assertion into auditable public benefit.

---

## XII. CORRESPONDENCE WITH *PETA v. CAMPBELL*

The side issue matters to the constitutional case because Plaintiff seeks more than recognition that undercover recordings can sometimes expose cruelty.

It seeks constitutional relief capable of facilitating covert entry and recording across a broad field of private animal-related operations.

The public-interest weight attached to that request depends upon what PETA is doing when it enters those facilities.

- An investigator documenting conduct already prohibited by law occupies one position.
- An organization collecting selected evidence inside an industry it seeks institutionally to abolish occupies a more complicated position.
- A whistleblower unexpectedly encountering unlawful conduct occupies another.
- A rescue organization falsely representing the quality of care it provides presents still another and, in many respects, a particularly strong case for covert accountability because the institution's represented public benefit is itself the object under examination.

Those distinctions provide the missing correspondence.

---

## CONCLUSION — ETHICAL TREATMENT REQUIRES A DEFINED RELATIONSHIP TO THE ANIMAL

PETA has produced genuine animal-care benefits. It has also expressly committed itself to an animal-rights project that extends beyond improved treatment and toward elimination of major categories of human animal use. Its own public materials make both propositions visible.

That duality requires precision.

The question is never merely whether PETA cares about animals.

The relevant inquiry is:

> **What form of human-animal relationship does PETA regard as legitimate, what standard does it use to classify treatment within that relationship, and what outcome does its intervention actually produce?**

Once those questions are separated, the apparent contradiction becomes measurable.

PETA's direct-care operations can be evaluated as stewardship.

- Its investigative work can be evaluated as evidence creation.
- Its enforcement campaigns can be evaluated according to legal violations proven.
- Its anti-use campaigns can be recognized as animal-rights advocacy.
- Its custody outcomes can be measured by what ultimately happens to the animals.
- And its claim to public benefit can be evaluated by correspondence among all of them.

That distinction brings the contested landscape into focus:

**Animal welfare asks whether stewardship is adequate.**
**Animal rights asks whether stewardship itself is permissible.**
**PETA operates across both propositions.**
**Law requires them to remain distinct.**

---

Respectfully submitted,
BMH

**Brandon Michael Hayes**
Pro Se
President, Natural Law Institute
159 Indian Hill Street
West Newbury, Massachusetts 01985
brandon@hayeshaus.com
(617) 438-2049

Dated: Sept. 8 2026